S. Brian MORGAN, Plaintiff,

v.

KANSAS CITY AREA TRANSPORTATION AUTHORITY, Defendant.

No. 86–1352–CV–W–8.

United States District Court,
W.D. Missouri, W.D.

Aug. 30, 1989.

Mimi E. Dohery, Deacy & Deacy, Kansas City, Mo., for plaintiff.

Taylor Fields, Colbert & Fields, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

STEVENS, District Judge.

Plaintiff filed this lawsuit alleging that he was discharged from his position as a graphic artist because of his race in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.* The section 1981 claim was tried to a jury while the court simultaneously heard the Title VII claim. After a four-day trial the jury returned a $60,000 verdict in favor of plaintiff on his section 1981 claim. The court reserved judgment on the Title VII claim pending the filing of post-trial motions. The case is currently before the court on defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial and on the court's determination of plaintiff's Title VII claim. The court will consider each claim seriatim.

### I. *Defendant's Motion for Judgment Notwithstanding the Verdict*

Section 1981 provides that

all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

42 U.S.C. § 1981. In his complaint plaintiff alleged that defendant denied him the protections guaranteed by section 1981 by discriminating against him on account of his race. The jury found for plaintiff on this claim, awarding damages of $60,000.

After defendant submitted its post-trial motions, the Supreme Court issued its opinion in *Patterson v. McLean Credit Union,* — U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In *Patterson* the Supreme Court held that "racial harassment relating to the conditions of employment is not actionable under section 1981 because that provision does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Id.* 109 S.Ct. at 2369. Specifically, the court explained that

the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.

*Id.* at 2373. The court concluded that Title VII, and not section 1981, is the proper remedy for individuals charging that they have been discriminated against in the conditions of their employment. *Id.* at 2374.

In the instant case plaintiff alleged that he was treated differently from similarly situated whites because defendant Kansas City Area Transportation Authority (KCATA) required him to keep logs and time records that other employees were not required to keep. Similarly, he alleged that the decision to terminate him from the graphic artist position was based on his race. Each of the discriminatory acts of which plaintiff complains occurred after he was hired by KCATA. This conduct is clearly the type of postformation conduct that the *Patterson* court found nonactionable under section 1981.

A question arises, however, as to whether the Supreme Court's decision in *Patterson* should be applied retroactively. The majority of courts faced with this question have not explicitly discussed the issue, but rather have implicitly found that the deci-

sion should be applied retroactively.[1] *See, e.g., Brooms v. Regal Tube Co.,* 881 F.2d 412 (7th Cir.1989) (appellate court reviewing district court's pre-*Patterson* ruling on section 1981 claim found that claim had to be dismissed because it was foreclosed by Supreme Court's decision in *Patterson* ); *Becton v. Burlington Northern Railroad Co.,* 878 F.2d 1436 (6th Cir.1989) (unpublished decision) (available on Westlaw, 1989 WL 74520) (appellate court affirmed district court's dismissal of section 1981 claim, noting that the judgment was affirmed in light of the Supreme Court's decision in *Patterson* rather than on the grounds stated by the district court); *Williams v. National Railroad Passenger Corp.,* 716 F.Supp. 49 (D.D.C.1989) (in case where court took defendant's motion for summary judgment under advisement and, in the interim, the Supreme Court issued its decision in *Patterson,* court granted the motion based on *Patterson* holding); *Greggs v. Hillman Distributing Co.,* 719 F.Supp. 552 (S.D.Tex.1989) (court dismissed section 1981 claim filed prior to *Patterson* on the ground that after *Patterson* the complaint failed to state a claim on which relief could be granted); *Woods v. Miles Pharmaceuticals,* No. 87 C 4944 (N.D.Ill.1989) (unpublished opinion) (available on Westlaw at 1989 W.L. 76171) (court considering section 1981 claim in case awaiting trial at time *Patterson* was decided held that claim must be dismissed in light of the Supreme Court's decision in *Patterson* ).[2]

This court joins the majority of courts finding that the Supreme Court's decision in *Patterson* should be applied retroactively. The court believes this result is consistent with the Supreme Court's test for retroactivity explained in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). In *Chevron,* the court stated that a decision will not be applied retroactively if it announces a new principle of law. *Id.* at 106, 92 S.Ct. at 355. In addition, a court deciding whether to apply a principle of law retroactively must consider "whether retrospective operation will further or retard" the purpose of the rule of law. *Id.* at 107, 92 S.Ct. at 355–56 (quoting *Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965)). Finally, a rule will not be applied retroactively if to do so would impose injustice or hardship. *Id.* In the instant case, the Supreme Court's decision in *Patterson* does not announce a new rule of law but, rather, clarifies the application of section 1981. The second factor, advancing the rule of law, does not tip the balance in either direction. The third factor, however, also weighs in favor of applying *Patterson* retroactively since plaintiff still may pursue a cause of action under Title VII. Consequently, no injustice or hardship would result to plaintiff. Therefore, the court will grant defendant's motion for judgment notwithstanding the verdict on the basis of the Supreme Court's decision in *Patterson,* rather than on the grounds advanced by defendant, and plaintiff's section 1981

---

**1.** One court, however, has explicitly held that *Patterson* cannot be applied retroactively. *Gillespie v. First Interstate Bank of Wisconsin Southeast,* 719 F.Supp. 649 (E.D.Wisc.1989). In *Gillespie* the court held that the Supreme Court's decision in *Patterson* should not be applied retroactively to a case that had been tried and was awaiting decision on post-trial motions at the time the Supreme Court announced the *Patterson* decision. The court found that a contrary result "would be entirely unfair and inequitable under the circumstances."

**2.** One district court has held that *Patterson* does not apply to a section 1981 discharge case because the "Court did not say that termination of an employee does not involve the formation process." *Padilla v. United Airlines,* 716 F.Supp.

485 (D.Colo.1989). The *Padilla* court concluded that the Supreme Court's decision in *Patterson* did not explicitly consider the termination aspect of section 1981 claims. This court believes that the case is not applicable to the situation presented here since, in the instant case, plaintiff's complaint of discrimination centers on conduct occurring during his employment. It was this conduct that caused his termination. In addition, the court disagrees with *Padilla* insofar as that case holds that termination claims could be actionable under *Patterson.* The court cannot conceive of a situation where the decision to discharge an employee would involve a "change in position … involv[ing] the opportunity to enter into a new contract with the employer," 109 S.Ct. at 2377, the test announced in *Patterson.*

claim will be dismissed and the jury verdict vacated.

## II. *Defendant's Motion for a New Trial*

■ Fed.R.Civ.P. 50(c) provides that if the court grants a motion for judgment notwithstanding the verdict it "shall also rule on the motion for a new trial ... by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for the new trial." *See also Lowe v. Conlee,* 742 F.2d 1140, 1141 (8th Cir.1984). This court may conditionally grant a new trial if the original verdict is against the weight of the evidence. *Brown by Brown v. Syntex Laboratories, Inc.,* 755 F.2d 668, 673 (8th Cir.1985). In making this determination "the court is not required to give the prevailing party the benefit of every favorable inference and it may consider the weight of the evidence...." *Washburn v. Kansas City Life Insurance Co.,* 831 F.2d 1404, 1409 (8th Cir.1987). *Accord Brown,* 755 F.2d at 673.

For the reasons set forth in the next section of this opinion the court believes that the jury verdict in the instant case is against the weight of the evidence. As noted below, plaintiff's supervisors made every effort to help plaintiff succeed in the graphic artist position. It was his refusal to abide by these procedures, and not his race, that prompted his discharge. Consequently, the court will conditionally grant defendant's alternative motion for a new trial.

## III. *Plaintiff's Title VII Claim*

■ As noted above, *Patterson* does not preclude plaintiff's claim based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Under ordinary circumstances, such as a situation where a claim is not precluded by the operation of *Patterson,* this court would be bound by the jury's verdict on the section 1981 claim in determining the Title VII claim. *See, e.g., Ways v. City of Lincoln,* 871 F.2d 750, 755 (8th Cir.1989) (if there is jury verdict in section 1983 claim the court is bound by

that verdict on Title VII claim); *Garza v. City of Omaha,* 814 F.2d 553, 557 (8th Cir.1987) (jury verdict on section 1983 claim collaterally estops parties from arguing for a contrary result in Title VII court-tried claim). Since no valid judgment exists on the section 1981 claim in this case, however, the court is not bound by the jury award and may consider the Title VII claim as if the jury verdict had not been entered.

■ At trial plaintiff testified that he began working for the KCATA as a graphic artist on July 16, 1984. He received a starting salary of $15,500 per year which he described as "generous." His job duties included preparing layouts and paste-ups of various brochures and flyers for the defendant. In accordance with KCATA policy plaintiff was put on probation for six months when he began working at KCATA.

One month after plaintiff began working at KCATA, Susan Schold, the head of the marketing and planning department, told him that Cari Jo Calvalcante would be his immediate supervisor. Plaintiff testified at trial that he and Calvalcante often had disagreements about his work. In an attempt to remedy these disagreements Calvalcante suggested in late 1984 that Morgan use project logs to keep track of his work. Each project log had a description of the assignment, the name of a contact person and a deadline date. Calvalcante signed each log after Morgan completed the project. It was uncontroverted at trial that plaintiff was the only employee in the department, white or black,[3] that was required to use project logs. Plaintiff testified that although he initially objected to the use of the logs, he later agreed to try them.

In addition to the project logs, Morgan testified that he was discriminated against on the basis of race in the approval of compensatory time (comp time). Plaintiff testified that Calvalcante refused to approve comp time when he wished to take a day off for Martin Luther King's birthday. Calvalcante, on the other hand, testified

---

**3.** Two other employees in the department, Lynn Alexander and Ollie Robinson, are black.

that she told plaintiff he could take the time off only if he finished a project that was due on Martin Luther King's birthday. Other KCATA employees testified at trial that while they had to obtain approval from their supervisors for comp time, that approval was usually always given. Plaintiff did not specify any times other than the Martin Luther King Day incident when Calvalcante did not approve his requests for comp time.

Calvalcante also testified at trial about her relationship with plaintiff. She explained that she was plaintiff's predecessor in the graphic artist position so she was familiar with his responsibilities. As his supervisor, she was responsible for orienting plaintiff to his new job and for evaluating his work. All of the witnesses testifying at trial, including Calvalcante, stated that Calvalcante and plaintiff often had disagreements about plaintiff's work. Both plaintiff and Calvalcante testified that some of these disagreements related to the manner in which plaintiff performed his work, with plaintiff often arguing that work should be done in one artistic medium rather than the medium preferred by Calvalcante. Calvalcante testified that while she disagreed with some of plaintiff's artistic choices, her main dissatisfaction was with the quality and quantity of plaintiff's work. She testified that she often had to stay late to clean plaintiff's paste-ups. In addition, she stated that plaintiff often missed deadlines because he worked so slowly.

As noted earlier, Calvalcante was responsible for evaluating plaintiff's work. Calvalcante rated plaintiff's performance as "below average" during his first evaluation in January 1981. Plaintiff testified that he was "shocked" after receiving this evaluation because he had made every effort to complete his work in a timely manner and was unaware that Calvalcante was displeased with his work. He did not, however, appeal the decision through the formal channels available to him because he said he was too busy with his work.

Despite the fact that plaintiff received a below average rating, Susan Schold decided to extend his probation period rather than to fire him. He was next evaluated in February 1985 when he received an "average" evaluation. At this evaluation Calvalcante stated that she was pleased with plaintiff's work and she discontinued the use of the project logs. At plaintiff's third evaluation in March 1985, however, Calvalcante again rated plaintiff's work "below average." Consequently, Calvalcante decided to reinstitute the use of the project logs. According to Calvalcante plaintiff agreed with this decision but wanted more control over the use of the logs. Plaintiff disputes this fact and vigorously argues that he did not want the logs reinstituted.

The two discussed the use of the project logs with Terry Mantony, Calvalcante's direct supervisor. At this meeting plaintiff refused to sign the logs because he felt that he did not have enough input into establishing deadline dates. Mantony and Calvalcante both testified that they explained to plaintiff that he would have the opportunity to change a deadline in a project log if he felt that it was unreasonable, even after he had signed the log. Plaintiff testified, however, that he did not believe he would be given this freedom and he was afraid that if he signed the log it meant that he had agreed to the stated deadline. Mantony told plaintiff to consider the proposal over the weekend. When he returned to work the following Monday and still refused to sign the logs he was fired for insubordination.

In addition to Calvalcante, several other KCATA employees testified about plaintiff's job performance. Mary Beth Van Sice, a management analyst, testified that she worked with Morgan on route maps and had no problems with the quality of his work. Lynn Alexander, the special programs coordinator, worked with plaintiff on the Business Builder Program (BBP) project. She stated that she had no problems with the quality of plaintiff's artistic work although he occasionally missed deadlines. She explained that she did not believe the missed deadlines were plaintiff's fault, however, since Terry Mantony was sometimes too busy to approve copy in time to return it to plaintiff for paste-up by

deadline. She stated that delays such as this one were common in the department because when people got busy it was more difficult for supervisors to provide the necessary approvals. Ollie Robinson, the public information specialist, worked with plaintiff for one month. Like Alexander, he stated that he did not have any complaints about plaintiff's work and, in addition, he testified that as far as he knew Morgan did not miss any deadlines because of slow work.

Although plaintiff's coworkers did not have complaints about the quality of his work, his supervisors in the department all testified that the quality of plaintiff's work was unacceptable. Terry Mantony, the manager of the marketing department, stated that plaintiff's paste-ups were sloppy and that he had problems meeting deadlines. She also had some concern about plaintiff's design capabilities. She noted that plaintiff and Calvalcante had a tense relationship with limited communication and that she tried to work with both of them to better this relationship.

Like Mantony, Susan Schold, the director of planning and marketing for KCATA, testified that plaintiff's work quality was not satisfactory. She noted that her dissatisfaction with plaintiff's work was documented in a memo she wrote to plaintiff extending his probation past the traditional six-month period. As an example of the poor quality of plaintiff's work, Schold testified that on one occasion plaintiff designed a route map for the ATA with Johnson County, Kansas placed on the east side of State Line Road. Plaintiff denied this mistake as did Mary Beth Van Sice who stayed late one night to help plaintiff finish the map.

In addition to plaintiff's supervisors, several members of the administrative staff testified at trial. Joseph Jones, the director of personnel, testified that he often saw plaintiff three or four times a day during his employment at KCATA. Jones testified that during these frequent meetings plaintiff never complained that he was being treated differently because of his race.[4] Jones also met with Calvalcante about the quality of plaintiff's work. He testified that although he was not a trained artist he could tell that lines on plaintiff's route maps were crooked and that excess rubber cement seeped out of the sides of some paste-ups, creating a messy work product.

Berkeley Pernell, the Equal Employment Opportunity Officer at KCATA, testified that plaintiff never filed any written complaints about his treatment while employed at KCATA. He explained that he investigated plaintiff's discharge for defendant and did not find that race was a motivating factor in the decision to discharge Morgan. Gayle Holliday, the deputy director of administration, reviewed this report and concurred in its findings.

It is now axiomatic that a plaintiff alleging race discrimination in a Title VII case establishes a prima facie case of employment discrimination by showing

(1) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). A plaintiff alleging discriminatory discharge, rather than discriminatory hiring practices, must show that he or she was replaced by a nonminority employee to prove the fourth prong of the test. *See Legrand v. Trustees of University of Arkansas, Pine Bluff*, 821 F.2d 478, 480 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988). Once the plaintiff establishes a prima facie case by showing that he or she was qualified for the given position, the burden of proof shifts to the defendant to

4. Like Morgan, Jones is black. At trial Jones testified that he encouraged Susan Schold to extend plaintiff's probation rather than discharge him because Jones felt he had a vested interest in seeing black employees succeed on the job.

**764**

show that plaintiff was terminated "for a legitimate, nondiscriminatory reason." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The plaintiff then has an opportunity to show that the proffered legitimate reason is merely pretextual. *Id.* at 256, 101 S.Ct. at 1095.

In the instant case plaintiff established a prima facie case of discrimination under Title VII by showing that he is black, was initially qualified for the job, was discharged and, after his discharge, was replaced with a white employee. The burden of proof then shifted to defendant to show that there were legitimate, nondiscriminatory reasons for the discharge. Defendant met this burden by showing that plaintiff's work was sloppy and often had to be redone and that plaintiff had difficulty meeting deadlines set by his supervisors. Although plaintiff called witnesses who testified that they had no problems with the quality of plaintiff's work, these witnesses were coworkers and were not in a position to evaluate his work product. Calvalcante, Mantony, and Schold, on the other hand, were directly responsible for approving and evaluating plaintiff's work. Thus, the court finds their testimony more credible in this case.

In addition, the court concludes that the proffered reason for plaintiff's discharge, his insubordination in refusing to sign the project logs, was not pretextual. KCATA supervisors required plaintiff to sign the project logs in an effort to help him control the quantity and quality of his work and, therefore, keep his job. Defendant could have terminated plaintiff after his initial six-month probationary period. Instead, defendant made every effort, including extending the probationary period and reinstituting the use of project logs, to help plaintiff keep his job as a graphic artist. Quite simply, plaintiff's supervisors took every possible step to help plaintiff keep his job but his work was consistently below average. When plaintiff refused to comply with the measures defendant had designed to help control work quality, the company had no choice but to discharge him. That action had nothing to do with plaintiff's race. Accordingly, it is

ORDERED that defendant's motion for judgment notwithstanding the verdict on plaintiff's section 1981 claim is granted. It is further

ORDERED that defendant's alternative motion for a new trial is conditionally granted pursuant to Fed.R.Civ.P. 50(c). It is further

ORDERED that judgment be entered in favor of defendant on plaintiff's Title VII claim.