**John A. WHITE and Claude C. Allen, Plaintiffs,**

v.

**FEDERAL EXPRESS CORP., Defendant.**

**Terri L. HOUSE, Plaintiff,**

v.

**FEDERAL EXPRESS CORP., Defendant.**

**Kevin BOYKINS, Plaintiff,**

v.

**FEDERAL EXPRESS CORP., Defendant.**

**Civ. A. Nos. 89–1094–A to 89–1096–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Jan. 30, 1990.

---

1540

questions concerning the scope of that statute after *Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), including whether certain racially motivated job assignment denials are actionable. The pendent state claims raise questions under Virginia law regarding incorporation of employee handbooks and employer personnel manuals into employment contracts, as well as the scope of the tort of unlawful discharge. And in addition to the questions on the merits, the motions for summary judgment on the Title VII claims raise several threshold abatement issues, including: (i) whether the Title VII claims are barred by the statute of limitations, (ii) whether those claims must be dismissed because they were filed before the expiration of the statutory conciliation period, and (iii) whether the claims must be dismissed on the ground that the allegations in the plaintiffs' complaints were not included in the charge filed with the EEOC.

This matter is before the Court on Federal Express's Motion for Summary Judgment on all claims in each case. No dispute exists as to the dispositive facts concerning the § 1981 and pendent state claims. These claims, then, are ripe for summary disposition. *See* Rule 56, Fed.R. Civ.P. Because the § 1981 claims are barred by *Patterson* and because the state claims fail under settled state law principles, summary judgment is appropriate for those claims. But the same result is not appropriate for the Title VII claims. Close scrutiny of Federal Express's abatement arguments discloses their lack of merit. And on the merits of the Title VII claims, disputed material fact issues preclude summary judgment.

William H. Horkan, Horkan & Berry, Fairfax, Va., for plaintiffs.

R. Mark Dare, Local Counsel, Hazel Thomas Fiske Beckhorn & Hanes, P.C., Falls Church, Va., Fred C. Begy, III and Martin K. LaPointe, Adler Kaplan & Begy, Chicago, Ill., and James R. Mulroy, II, Federal Express Corp., Legal Dept., Memphis, Tenn., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

In these three related civil actions, four black, present or former employees of the Federal Express Corporation ("Federal Express") allege disparate treatment and racial harassment claims in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 ("Title VII"). Additionally, plaintiffs assert pendent state claims for breach of contract and unlawful discharge.[1] The § 1981 claims present substantial

### Background

At all relevant times, the plaintiffs were employed by Federal Express as couriers at its Springfield, Virginia facility. White

---

1. This Court's jurisdiction over the § 1981 claims is proper as they present federal questions. 28 U.S.C. § 1331. Jurisdiction over the Title VII claim is specifically authorized. 42 U.S.C. § 2000e–5(f)(3). And jurisdiction over the pendent state claims exists because they derive from a common nucleus of operative facts with the two federal claims. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

was initially hired in 1979,[2] Allen in 1984, Boykins in 1983, and House in 1980.[3] White, Allen, and Boykins were discharged by Federal Express in 1988, ostensibly for misconduct. House remains employed by Federal Express.

White and Allen were discharged on August 3, 1988 after Allen allegedly punched in White's time card indicating that White was present when he was not. At approximately 8:25 a.m. on July 29, Allen was observed by two managers entering the room where the time clock was located. A subsequent review of the time cards for that day revealed that Allen had punched in at 8:26. White's time card indicated he had punched in at 8:30, but White, at that time, had not yet reported for work. A review of the time records disclosed that Allen and White had punched in at approximately the same time on a number of other occasions over the preceding six weeks. On August 1, White and Allen were suspended pending the outcome of an investigation. When confronted with the evidence, Allen admitted in a signed confession that he had been punching in for White for a period of one month to accommodate White's commuting traffic problems. Based on this confession, Federal Express discharged both White and Allen.[4] Allen unsuccessfully appealed his dis-

charge through Federal Express's three step grievance procedure [5] as set out in the *Federal Express Employee Handbook* ("the Handbook") [6] and the *Personnel Policy and Procedure Manual* ("the Manual") [7]. White filed an appeal, but chose not to pursue it after Federal Express was late in responding to his grievance complaint.

In addition to the claim based on his discharge, White also alleges two other disparate treatment claims. The first arises from the aggravation of a work related back injury. White suffered a herniated disc in September 1986 while lifting heavy boxes on the job. As a result, he was forced to take extended periods of leave over the next year. When he returned to work, White alleges that management refused to assign him to light duty, either in the office or on a route with little heavy lifting. An injured white employee, he claims, would have received such a light duty assignment. Instead, he was ordered to return to his regular duties, which involved some heavy lifting. In performing these duties, he reinjured his back, an injury he contends was caused by management's discriminatory refusal to assign him to light duty. White's final disparate treatment claim arises from the denial of his three requests for transfer to a dispatch-

---

2. White was discharged in November, 1981, but reinstated in 1984 in accordance with the judgment entered in two subsequent suits challenging the 1981 dismissal. *See White v. Federal Express Corp.*, Civil Action Nos. 83–1293–A and 84–0110–A, slip op. (E.D.Va. July 12, 1984). In those suits, as here, White alleged violations of Title VII, § 1981, and his employment contract.

3. House was initially hired in Chicago. She transferred to Virginia in 1983.

4. These discharges occurred shortly after the Springfield station had implemented control measures to prevent and detect time clock abuses. First, the station's old time clock, which recorded only the time of day, was replaced with one that recorded the date and day of week, as well as the time. And on July 11, 1988, just three weeks before the incident, the station's senior manager issued a written warning to all employees that falsifying any company documents with the intent to defraud Federal Express would result in termination.

5. Step one of the grievance procedure consists of a review of the grievance within seven days

by the complainant's manager, senior manager and managing director. Step two of the procedure consists of a review by the complainant's vice president or senior vice president within seven days of the step one decision. Step three consists of a review by an appeals board composed of Federal Express's chief executive officer, chief operating officer, chief personnel officer, and two senior vice presidents. The step three procedure should be completed within seven days of the step two decision. Federal Express Corp., *Personnel Policy & Procedure Manual* P7–43 (rev. May 16, 1988).

6. The *Federal Express Employee Handbook* provides each employee with general information about the Company and serves as a quick reference to assist an employee in locating the appropriate source to answer questions concerning his employment.

7. The *Personnel Policy and Procedure Manual* is Federal Express's source document for personnel policies and procedures.

er's position. White applied for these transfers in February, April, and November of 1987, but each time, he claims, the position was filled by a white employee.

Boykins disparate treatment claim arises from his discharge for a poor record of unexcused tardiness and absenteeism. Boykins was discharged on December 7, 1988. During the preceding two and one half years, Boykins had been late 16 times, and absent eight times. During the six months preceding September 29, 1988, he had been late three times and absent four. He had also been issued two written warnings: one for tardiness and one for overlooking a container of freight. After being late on September 28, he was given a "decision day" on September 29.[8] Following this decision day, Boykins's attendance was apparently perfect until he was late on December 5. He was immediately suspended and subsequently discharged on December 7. Boykins unsuccessfully appealed his discharge through the first step of Federal Express's grievance procedures. His request to proceed to the second step of the grievance procedures was remanded to Federal Express's Equal Opportunity Office in light of his allegation that his dismissal was racially motivated.

House, unlike the other plaintiffs, remains employed as a courier by Federal Express at the Springfield station. But she claims that her supervisors acted with racial animus when they gave her a low performance review and denied her a transfer from the night shift to the day shift, while granting such transfers to white employees with less seniority. The adverse performance review occurred in October 1988, and House alleges that it was directly related to her complaints to management about racial discrimination in the Springfield station. As a result of this adverse review, House claims to have lost a bonus of approximately $500. House also states that in both April 1988 and March 1989, management refused to transfer her to the day shift, where she could have made more money, but transferred instead less senior white employees.

In addition to these individual disparate treatment claims, all plaintiffs assert that Federal Express maintained a racially hostile environment at the Springfield station. This hostile environment allegedly included (i) discriminatory performance reviews, (ii) documenting and disciplining only black employees for minor rule violations, (iii) discriminatorily discharging and refusing to rehire blacks, (iv) refusing to place black employees on light duty, (v) discourteous treatment of black employees by managers, (vi) assigning black employees to less desirable shifts, (vii) refusing to permit black employees to split heavy loads between drivers, (viii) use of racial epithets and slurs by white employees to black employees, (ix) retaliation for complaints about racial discrimination and harassment, and (x) not following the company's grievance procedures for black employees.

*Analysis*

A. *The Section 1981 Claims*

All four plaintiffs assert racial harassment and disparate treatment claims under § 1981. These claims fail given the Supreme Court's recent ruling in *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), sharply limiting the scope of § 1981. By its terms, that section applies to the "right ... to make and enforce contracts...." *Patterson*, in the context of an employment discrimination suit, reaffirmed § 1981's applicability to private contracts. 109 S.Ct. at 2372. But Justice Kennedy, speaking for the majority, significantly restricted the scope of this statute to its plain language. He wrote:

> The most obvious feature of [§ 1981] is the restriction of its scope to forbidding discrimination in the "mak[ing] and enforce[ment]" of contract's alone. Where

---

**8.** Under Federal Express's Performance Improvement Policy, written reminders or warnings are given by managers to advise an employee of a performance deficiency. If the deficiency is not corrected, the employee is granted a "decision day", a day off with pay to consider whether he wishes to remain employed with Federal Express and, if so, to formulate a plan for improvement of his performance.

an alleged act of discrimination does not involve the impairment of one of these specific rights, § 1981 provides no relief. Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts.

*Id.* Justice Kennedy went on to define narrowly the rights to "make" or to "enforce" a private employment contract. In this regard, the right to "make" a contract was held to

extend[ ] only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment. The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established; including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contractual obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.

109 S.Ct. at 2372. Similarly, the right to enforce a contract was held only to

embrace[ ] protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race. In this respect, it prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race, and this is so whether this discrimination is attributed to a statute or simply to existing practices. It also covers wholly *private* efforts to impede access to courts or

obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations, . . . .

109 S.Ct. at 2373. With a single exception, therefore, *Patterson* draws a bright line distinction between pre-contract formation conduct, which is actionable only when it concerns the right to make a contract, and post-contract formation conduct, which is actionable only when it impairs the right to enforce a contract. The sole exception concerns discrimination that affects promotions. Discriminatory promotion practices, because they may implicate the right to make a new employment contract, may state a § 1981 claim even though they constitute post-contract formation conduct unrelated to contract enforcement. After *Patterson*, therefore, post-contract formation work place racial harassment and disparate treatment claims that do not involve contract enforcement or promotion remain actionable under Title VII, but not § 1981. 109 S.Ct. at 2374–75; *see also McGinnis v. Ingram Equip. Co.*, 888 F.2d 109, 111 (11th Cir.1989); *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 479 (6th Cir.1989); *Lynch v. Belden & Co.*, 882 F.2d 262, 267 (7th Cir.1989); *Matthews v. Freedman*, 882 F.2d 83, 85 (3d Cir.1989).[9]

▪ Plaintiffs' § 1981 claims all involve post-contract formation racial harassment and racially motivated disparate treatment. As such they are barred by *Patterson* unless the charged conduct impairs contract enforcement rights or involves denial of a qualifying promotion. To escape the bar of *Patterson*, plaintiffs make two arguments. First, White, Allen, and Boykins argue that their terminations operate to impair their right to enter into contracts. In support, they cite *Padilla v. United Air Lines*, 716 F.Supp. 485 (D.Colo.1989). *Padilla* indeed held that termination affects the very existence of the employment contract, and, therefore, impairs the right to make a contract. 716 F.Supp. at 490. But *Padilla* seems flatly contrary to *Patterson*. Understandably, courts have uniformly criti-

---

**9.** *Cf. Fowler v. McCrory Corp.*, 727 F.Supp. 228 (D.Md.1989) (Post–*Patterson*, § 1981 still protects the right to give evidence). But no claim is made here that plaintiffs were denied their right to give evidence.

cized *Padilla* and declined to follow it. *See Morgan v. Kansas City Area Transp. Auth.*, 720 F.Supp. 758, 760 n. 2 (W.D.Mo. 1989); *Hall v. County of Cook*, 719 F.Supp. 721, 723 (N.D.Ill.1989); *Rivera v. AT & T Info. Sys.*, 719 F.Supp. 962, 964 (D.Colo.1989) (same district as *Padilla* court). As succinctly stated in *Morgan:* "The court cannot conceive of a situation where the decision to discharge an employee would involve a 'change in position ... involv[ing] the opportunity to enter into a new contract with the employer'." 720 F.Supp. at 760 n. 2 (quoting *Patterson* ). This Court concurs with *Padilla*'s critics; termination does not impair the right to make a contract. Accordingly, plaintiffs' § 1981 termination claims fail.

■ In a second effort to avoid *Patterson,* White and House argue that they were discriminatorily denied promotions.[10] After *Patterson* some, but not all, promotion opportunities are entitled to protection under § 1981. To determine which promotions qualify, the Supreme Court enunciated a "new and distinct relation" test: A § 1981 cause of action exists if "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." *Patterson,* 109 S.Ct. at 2377. As it happens, however, *Patterson* furnishes scant guidance on how to identify promotion opportunities that meet the "new and distinct relation" test. As its sole example, the Court cited *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), a Title VII case concerning a law firm's refusal to accept a female associate for partnership. *Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908 (4th Cir.1989), is the only Fourth Circuit opinion on whether a particular promotion satisfies the test. There, the court held that "promotion from a clerk to a supervisor [in a company's accounting department] with a consequent increase in responsibility and pay satisfies this [*Patterson* ] test." But beyond noting that an

increase in responsibility and pay were sufficient, the Fourth Circuit did not elaborate on the test's criteria.

A more extensive discussion of the issue appears in *Malhotra v. Cotter & Co.,* 885 F.2d 1305 (7th Cir.1989). There, a Seventh Circuit panel, in three separate opinions, noted three possible interpretations of the "new and distinct relation" test announced in *Patterson.* The first focuses on whether the terms of the contractual relationship between the employee and the employer would change ("the contract test"), 885 F.2d at 1311 (main opinion), 1317 (Ripple, J., concurring). The second focuses on whether an outsider to the firm could fill the position in issue ("the outsider test"), 885 F.2d at 1311 (Posner, J.). And the third interpretation focuses on whether the promotion would involve a substantial change in the plaintiff's job duties or responsibilities ("the job requirements test"), 885 F.2d at 1317 n. 6 (Cudahy, J., concurring). The outsider and job requirements tests are broader than the contract test and address a perceived anomaly created by that test. The anomaly arises because, applying the contract test, a stranger to the firm could sue under § 1981 if denied employment on racial grounds. An employee of the firm, however, could not sue for an identically motivated denial of promotion to the same position unless the promotion would have created a new contract between the employee and the employer. The broader outsider and job requirements tests eliminate the anomaly by excluding only "routine" promotions, *e.g.*, changes in civil service pay grades that depend almost solely on longevity, from redress under § 1981. *See* 885 F.2d at 1311 (discussing the outsider test). All other promotions would remain actionable.

Of the three tests proposed in the *Malhotra* opinions, the contract test is the most faithful interpretation of *Patterson.* It is clearly in line with the *Patterson* mandate to give § 1981 a "fair and natural reading".

---

**10.** Only the promotion claims of White and House survived discovery. Allen conceded in his deposition that he was not seeking redress for loss of promotional opportunity. And the uncontradicted record indicates that Boykins never applied for either a promotion or a reassignment.

109 S.Ct. at 2377 (quoted in *Malhotra*, 885 F.2d at 1318 (Ripple, J., concurring)). *Malhotra*'s proposed outsider and job requirements tests are too broad. These tests sweep within § 1981 not only true promotions, but also lateral transfers that merely involve new duties without significant changes in responsibilities and pay. But it is the significant changes in responsibilities and pay, cited in *Mallory* and implicit in the promotion in *Hishon*, that form the heart of any new contract between an employee and an employer. Thus, the *Malhotra* contract test embodies best the criteria set out in *Patterson* and is most consistent with the results in *Hishon* and *Mallory*. Moreover, any anomaly created by application of this test is mitigated by an employee's right to bring suit under Title VII. *See Patterson*, 109 S.Ct. at 2374 (Supreme Court recognized that narrowing of § 1981 was ameliorated by existence of Title VII).

■ Applying the contract test and using *Hishon* and *Mallory* as benchmarks, The Court concludes that White's and House's claims, the only surviving promotion claims, fail to satisfy the *Patterson* "new and distinct relation" test. White states a substantial, but not sufficient, case for meeting the contract test. He alleges a denial of promotion from courier to dispatcher on three occasions. But the record reflects that the courier to dispatcher change was more in the nature of a lateral transfer than a promotion. Neither couriers nor dispatchers have supervisory responsibilities. Both are hourly, nonsupervisory employees. While the jobs involved different tasks, the level of responsibility is essentially the same. Couriers are responsible for timely and proper pick-up and delivery of parcels. Dispatchers are responsible for relaying customers' orders to couriers. They do not originate or create the orders they relay to couriers. Nor is there any significant difference in pay;

White, had he become a dispatcher, would have received a $1 per hour increase, but would have remained a supervised hourly employee. Such minor differences in courier and dispatcher tasks and pay do not rise to the level of an "opportunity to enter into a new contract with the employer," *Patterson*, 109 S.Ct. at 2377, nor are they equivalent to the position changes at issue in *Hishon* or *Mallory*. Were the Court to hold otherwise, virtually all requests for changes in job assignments would be swept back within the ambit of § 1981, a result at odds with the thrust of *Patterson*.

■ House's claim similarly fails, for she merely sought reassignment between shifts and routes. Even had her requests been granted, she still would have been a courier; her job requirements and responsibilities would have been identical. Thus neither White's nor House's claim satisfies the "new and distinct relation" test.[11]

In summary, therefore, all of the plaintiffs' § 1981 claims fail. General work environment racial harassment is no longer actionable after *Patterson* because it does not involve conduct that implicates either the right to make, or the right to enforce, a contract. Nor are post-contract formation disparate treatment claims, with the exception of discriminatory promotion practices, actionable under § 1981, as they involve conduct unrelated to the right to enforce the contract. And finally, while discriminatory denials of promotion may fall within § 1981, none of the plaintiffs sought a change in position sufficiently substantial to rise to the level of a new and distinct relation with Federal Express, as required by *Patterson*.

**B.** *The Pendent State Claims*

Three plaintiffs, White, Allen, and Boykins, allege state breach of contract claims and, it appears, a tort claim for unlawful

---

**11.** Additionally, plaintiffs assert that, because of their negative impact on promotions, discriminatory performance reviews and discipline are tantamount to denial of promotion. This argu-

ment, if accepted, would effectively erase *Patterson*. The Court does not reach this issue, however, because none of the plaintiffs sought a

discharge.[12] The breach of contract claims are based on the contentions first that the grievance procedures set out in the Handbook and the Manual are part of the plaintiffs' employment contracts and second that Federal Express breached those contract terms by denying plaintiffs access to the procedures. More specifically, White alleges that Federal Express denied him access to the grievance procedures by not responding to his initial grievance complaint in a timely manner. The record indicates that White wrote his first grievance letter on August 9, 1988 but Federal Express did not respond until August 26, 1988, ten days past the seven days allotted for response in the procedures. Although ten days late, Federal Express nonetheless attempted to proceed with White's grievance. For reasons not apparent in the record, White rejected this opportunity and chose not to continue. Allen and Boykins allege that Federal Express did not reinstate them because it failed fairly and adequately to investigate and consider their grievance claims. Allen unsuccessfully appealed his dismissal through all three steps of the grievance procedures. Boykins unsuccessfully appealed his dismissal through the first step, but, in accordance with the Manual's procedure,[13] his grievance was then referred to Federal Express's internal Equal Employment Opportunity office given the allegations of race discrimination.

■ Analysis of plaintiffs' contract claims properly begins with the identification of what constituted their employment contracts and the terms of those contracts.

The only contracts between Federal Express and plaintiffs were signed job applications. The most significant provision of these applications provided that the employment was to be terminable at will:

> That should [the employee] be given employment ... such employment shall be for an indefinite period and may be terminated at any time without notice or liability for wages or salary, except such earned at date of such termination, and without any other liability whatsoever....

The applications also expressly incorporated the Manual: [14]

> That all terms and conditions of ... employment except to the extent covered specifically by this contract or any other valid contract between [Federal Express] and [employee] ... shall be determined and governed by [Federal Express's] Policies and Procedures Manual, as same may be amended from time to time hereafter....

Thus, the plain language of the agreements evidences two pertinent facts. First, the plaintiffs' employment contracts were terminable at will; Federal Express could discharge them at any time for any reason. Correspondingly, plaintiffs were free to seek other employment at any time. Second, all the terms of employment not covered in the contract were to be determined by reference to the Manual, a document that Federal Express could unilaterally "amend[ ] from time to time." In exercising its right to amend the Manual, Federal

---

new position that satisfied the *Patterson* "new and distinct relation" test.

**12.** House, the fourth plaintiff, is still employed by Federal Express and, hence, has no wrongful termination claim. Nor does she make a claim for breach of contract. Her complaint refers to breach of contract only in the introductory paragraph and does not thereafter assert or spell out such a claim.

**13.** *See* Federal Express Corp., *Personnel Policy and Procedure Manual* P4–25–2 (Nov. 26, 1986). The record does not reflect why Allen's appeal of his dismissal was not similarly referred to Federal Express's internal EEOC office. Presumably, Allen's appeal did not set out his present racial discrimination claims, and Feder-

al Express reviewed his appeal for defects other than discrimination.

**14.** Plaintiffs' reliance on the Handbook as a source of employment contract rights is misplaced. As noted, the Handbook is merely a ready reference from which each employee may ascertain the appropriate source document to address a particular problem. *See supra* note 6. Also, the Handbook, in contrast to the Manual, was not expressly incorporated into the plaintiffs' employment contracts. Moreover, Federal Express amended the Handbook in 1986 to include an express disclaimer that the document created contract rights. Finally, each plaintiff signed a receipt acknowledging that the Handbook did not create contract rights.

Express plainly had the power to expand, constrict, or even eliminate contract terms incorporated from the Manual that had not vested. And eliminate terms is precisely what Federal Express did. In May 1987, the Manual's Termination Policy was amended to read:

### Employment at Will

The employment relationship between the Company and any employee may be terminated at the will of either party as stated in the employment agreement signed upon application for employment. As described in that agreement, the policies and procedures set forth in this manual provide guidelines for management and employees during employment, but do not create contractual rights regarding termination or otherwise.

The Manual's Introductory section was similarly amended in June, 1987 to provide:

This manual is intended solely as a guide for management and employees during employment. It is not a contract of employment, and no such contract may be implied from its provisions. Nothing in this manual shall be construed to abrogate the employment agreement signed upon application for employment preserving the Company's and the employee's right to terminate this relationship at the will of either party.

Federal Express argues that these provisions make unmistakably plain that the Manual no longer creates any contract rights between the parties and, therefore,

that the plaintiffs were not contractually entitled to the Manual's grievance procedures. This contention raises the question whether, under Virginia law, a disclaimer of previously incorporated rights is possible. The answer, gleaned from authorities that are analogous, but not directly in point, is "yes" as to unvested rights and "no" as to contract rights already vested.

In *Hercules Powder Co. v. Brookfield*, 189 Va. 531, 53 S.E.2d 804 (1949), the Virginia Supreme Court held that an employee handbook contractually bound the company to pay severance pay in accordance with a plan set out in the handbook.[15] Notably, the plan contained an express reservation that permitted the company to alter or discontinue the plan at any time. While tacitly approving the company's right to amend the plan unilaterally at any time, the Virginia Supreme Court noted that such alterations were valid only if they did not "deprive the plaintiff of benefits ... already earned as of the date of discontinuance." 53 S.E.2d at 809. *Hercules Powder*, then, teaches that the disclaimers added to the Manual are effective to prevent the creation of any contract rights not already vested. This result is wholly consistent with the at-will nature of the instant employment relations and Virginia's continuing adherence to the at-will employment doctrine.[16]

The question then becomes whether plaintiffs' grievance procedure rights vested before the disclaimers were added to the Manual. It seems reasonable to conclude

---

15. In Virginia, provisions of employee manuals are not, *per se*, considered terms of the underlying employment contract. *See Barger v. General Electric Co.*, 599 F.Supp. 1154, 1163–64 (W.D. Va.1984); *Frazier v. Colonial Williamsburg Found.*, 574 F.Supp. 318, 320 (E.D.Va.1983). But the Virginia Supreme Court has held that the provisions of an employee handbook may constitute an offer of a unilateral contract which employees may accept by continuing their employment. *Hercules Powder Co. v. Brookfield*, 189 Va. 531, 53 S.E.2d 804, 808 (1949); *see also Dulany Foods Inc. v. Ayers*, 220 Va. 502, 260 S.E.2d 196, 202 (1979) (memorandum setting out severance pay plan constituted offer for unilateral contract to induce employees to continue working during plant's final four months of operation). Federal courts in Virginia, applying *Hercules Powder*'s and *Dula-*

*ny Foods*'s contract analysis, have permitted the trier of fact to resolve whether employee manual provisions constitute the terms of an implied-in-fact contract between the employee and employer. *See Thompson v. American Motor Inns*, 623 F.Supp. 409, 416–17 (W.D.Va.1985); *Barger*, 599 F.Supp. at 1164; *Frazier*, 574 F.Supp. at 321. No jury issue is presented here because the Manual is expressly incorporated and the contract unambiguously grants Federal Express (i) the right to amend the Manual unilaterally and (ii) the right to disclaim the creation of contract rights.

16. For a recent reaffirmation of the vitality of the employment-at-will doctrine in Virginia, see *Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E.2d 915, 916–17 (1987).

that a right to specific grievance procedures, unlike a right to severance pay, does not vest on commencing and continuing employment. Instead such a right vests only at the time a grievance arises. Were this not so, then the unilateral right to amend the Manual from time to time is rendered a nullity and anomalous consequences result. Thus, if the right to specific grievance procedures vested on commencement of employment, Federal Express could only change or eliminate the procedures for prospective new hires. And, if it changed or revised the procedures periodically, as plainly contemplated,[17] all of the previous procedures would have to be maintained in place in the event employees, who were employed years earlier when those procedures were in effect, filed a grievance. This anomalous result is avoided and fairness to employees is retained by recognizing, per *Hercules Powder*, the validity of the unilateral right to amend the Manual and eliminate contract rights as limited by the distinction between vested and unvested rights. In this case, the grievances all arose after the inclusion of disclaimers in the Manual effectively eliminated grievance procedures as a contract right.[18]

■■■■ Moreover even assuming that plaintiffs have a contract right to the grievance procedures, the uncontradicted record shows no breaches. White initially appealed his dismissal, but then chose not to pursue his grievance further. Despite Federal Express's tardiness in responding to his initial complaint, White's failure to pursue his appeal after being given an opportunity to do so, effectively waived any contract right that might have existed. Boykins, too, cannot show a breach. His grievance appeal was properly referred to Federal Express's internal EEO department after the initial appeal due to his allegations of discrimination. This referral was all he was entitled to under the Manual even assuming the grievance procedures had the status of a contract right. And Allen's grievance appeal received the full three stage treatment. Nothing more was provided by the procedures. There is no breach here, either. The fact that Allen now claims that the procedures failed to reinstate him because he is black is not a cognizable claim within the grievance procedures. Such claims are handled by Federal Express's internal EEO office. Moreover, this specific claim is adequately addressed through a Title VII claim, not an alleged breach of contract.[19]

■■■■ Apart from breach of contract, the three terminated plaintiffs arguably assert a state tort claim for unlawful discharge.[20] The undisputed facts at bar do not support such a claim under Virginia law. Virginia's unlawful discharge tort is narrowly defined. It is chiefly limited to statutory exceptions to the at-will employment doctrine. *See, e.g.,* Va.Code Ann. § 18.2–465.1 (unlawful to discharge employee for absence attributable to jury duty); Va.Code Ann. § 65.1–40.1 A (unlaw-

**17.** The course of dealing between the parties further supports the Court's conclusion. Federal Express amended the grievance procedure twice since 1980, altering the format from a seven step to a five step to a three step procedure. The record is devoid of any objection to these changes. The parties, therefore, must have understood that a right to the grievance procedure did not vest until a dispute arose.

**18.** Nothing in this opinion should be construed as deciding the status of any Manual provisions other than the grievance procedures.

**19.** Contrary to plaintiffs' contention, collateral estoppel based on *White v. Federal Express Corp.,* Civil Action Nos. 83–1293–A and 84–0110–A, slip op (E.D.Va. July 12, 1984) (consolidated cases), does not compel a different result. In that case the Court permitted White to pursue a breach of contract claim based on the grievance procedures, but at that time neither the Handbook nor the Manual contained any of the disclaimers present in the current versions. This Court, therefore, is not bound by the earlier decision because it did not decide the issue presented here.

**20.** Count II of the Boykins and the White and Allen complaints are identical. These counts are all titled "Unlawful Discharge and Breach of Contract." But except for the caption and the reference to tort damages in the *ad damnum* clause, the Count II's say nothing about the tort claim. Thus it is at least unclear, if not doubtful, that the complaints effectively assert a tort claim for unlawful discharge. In the interests of efficiency, it is assumed *arguendo.*

ful to discharge employee for applying for worker's compensation). The only non-statutory exception to the at-will rule is for discharges that violate a public policy embodied in statutorily created rights where the employee's exercise of those rights is not otherwise explicitly protected. *See Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797, 801 (1985) (unlawful to discharge employee/shareholders for exercising their statutory right to vote their company stock freely). But this common law public policy exception to the at-will rule is expressly limited to protection of public, not private, rights. *See Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E.2d 915, 918–19 (1987) (discharge in violation of private, not public, rights not actionable).

■ These principles, applied here, compel the conclusion that plaintiffs' unlawful discharge tort claims are meritless. No claim can be sustained based on the grievance procedures claims, for, at best, these are private rights. Nor can plaintiffs maintain a wrongful discharge cause of action based on the public policy codified in Title VII. While the court in *Fielder v. Southco Inc.*, 699 F.Supp. 577 (W.D.Va.1988), recognized such a cause of action, neither the Virginia General Assembly nor the Virginia Supreme Court have yet done so. And, as these are the cognizant Virginia authorities, this Court must await their decision before it may do so. *See Gravins v. International Playtex, Inc.*, 586 F.Supp. 251, 252 (E.D.Va.1984) ("[a]s long as representative government exists, there is no excuse for a court arrogating to itself the authority to move the law along some purportedly wise or socially desirable path"). Thus, the plaintiffs wrongful discharge tort claims, like their breach of contract claims, also must be dismissed.

## C. *Title VII*

### (1) Statute of Limitations

■ Federal Express contends that the applicable statute of limitations bars White's claims of (i) discriminatory denial of his transfer requests and (ii) discriminatory failure to assign him to light duty following his leave of absence for a back injury. As Federal Express concedes, because White filed his administrative claim with an EEOC deferral agency, the Fairfax County Human Rights Commission ("FCHRC"),[21] that agency's one year statute of limitations [22] applies, not the 180 day limitations period set out in Title VII.[23] White filed his administrative claim on January 30, 1989. Nevertheless, because the denials of requests for transfer and assignment to light duty occurred prior to January 30, 1988, Federal Express asserts that these claims are untimely.[24]

■ The flaw in this position is that White has alleged a continuing course of racially discriminatory conduct by Federal Express. Under such circumstances, the statute of limitations does not begin to run until the last act has occurred, and if suit is thereafter timely brought, all the earlier discriminatory acts are swept within the limitations period. *See White v. City of Suffolk*, 460 F.Supp. 516, 519 (E.D.Va.1978) (application of continuing violation rule in Title VII context); *Bradley v. Carydale Enterprises*, 707 F.Supp. 217, 220–22 (E.D.Va.1989) (application of continuing violation rule in non-Title VII context). In applying this rule, the discriminatory acts alleged must be specific; mere accusations of general discrimination will not suffice. This rule balances the tension between the competing Title VII and statute of limitations

---

**21.** The FCHRC is a certified designated § 706 agency under Title VII. 29 C.F.R. § 1600.80. Filing the initial administrative complaint with such an agency is equivalent to filing it with the EEOC.

**22.** Fairfax County Code § 11–1–16.

**23.** 42 U.S.C. § 2000e–5(e).

**24.** White was last denied reassignment to dispatcher in November, 1987. Federal Express

claims that the refusal to assign him to light duty happened before January 30, 1988, but the record is silent on the precise date White was denied assignment to light duty. Federal Express bases its assertion on the fact that White's doctor cleared him for return to work on January 22, 1988. Given the disposition of this argument on other grounds, however, the exact date of the denial is immaterial.

policies. Statutes of limitations bar stale claims, while Congress intended Title VII to have a broad remedial effect on work place racial discrimination.

White's allegations satisfy the continuing violation rule. He complains of specific acts of discrimination, *i.e.,* refusals to reassign him to dispatcher, refusals to assign him light duty, and finally, his discharge. The act of discriminatory discharge is the key to the limitations issue. It occurred on August 3, 1988, within one year of the filing of the FCHRC complaint. Consequently, White's termination is the final act in the continuing course of alleged actionable conduct and serves to sweep the prior discriminatory acts within the limitations period.

Federal Express's authorities are inapposite. In *De Medina v. Reinhardt,* 444 F.Supp. 573 (D.D.C.1978), the court refused to apply the continuing violation rule to a series of refusals by a federal agency to hire the plaintiff. The court first determined that each refusal was a discrete act and then applied the well-settled exception to the continuing violation rule that isolated and completed acts against a particular individual are not within the rule. Determinations of this sort must be made on a case by case basis. *See id.* at 576. By contrast, in the case at bar, White has alleged an uninterrupted pattern of discrimination, not a series of isolated, completed acts. The pattern began at least as early as the first refusal to reassign White to the dispatcher position. It ends with his discharge. *West v. ITT Continental Baking Co.,* 683 F.2d 845 (4th Cir.1982), which holds that subsequent complaints about the last discriminatory act do not start the limitations period running anew, is not applicable here, for White does not rely on a subsequent complaint to bring his claim within the limitations period. The last act, White's discharge, clearly fell within the FCHRC's statute of limitations. Since the continuing violation rule applies, White's causes of action are not time barred.

**(2) Post-suit Receipt of Right–to–Sue Letter**

Federal Express next argues that White, House, and Boykins [25] did not wait the requisite period after filing their claims with the FCHRC before filing this action. In order to permit time to attempt conciliation, Title VII mandates that a complainant wait 180 days from the date of the filing of a complaint with either the EEOC or one of its deferral agencies before filing a Title VII law suit. 49 U.S.C. § 2000e–5(f)(1). If conciliation efforts fail, the EEOC, at the expiration of this 180 day period, issues a right-to-sue letter as evidence of the complainant's right to proceed with a Title VII action in district court.

Federal Express correctly asserts that all three plaintiffs failed to wait the requisite 180 day period. White filed his FCHRC complaint on January 30, 1989; Boykins filed his FCHRC complaint on February 27, 1989; and House filed her FCHRC complaint on March 2, 1989. All three filed their complaints in this action on July 27, 1989: 178, 150, and 147 days, respectively, after filing their FCHRC complaints. Thus all three plaintiffs violated the 180 day requirement. Arguably, therefore, this Court was without subject matter jurisdiction over these suits when they were initially filed. No objection was then noted and on November 2, 1989, more than 180 days from the filing of the last FCHRC complaint, the EEOC issued right-to-sue letters to all four plaintiffs. Plaintiffs promptly moved to amend their complaints to include these letters. The Magistrate granted this motion and Federal Express now appeals the Magistrate's order as to all four plaintiffs, and additionally, asserts the failure of White, House, and Boykins to wait the statutory period as a ground for summary judgment.

Case law in this area suggests that Federal Express's appeal and companion summary judgment motion must fail. To ensure that a plaintiff has exhausted all the

---

**25.** Though the same facts apply to Allen, Federal Express has not raised this defense against him.

**1552**

administrative remedies and adhered thereby to the Congressional conciliation scheme, courts generally hold that the right-to-sue letter is a jurisdictional prerequisite to a Title VII suit. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973). But, because Title VII is a remedial statute, courts usually construe its provisions generously to achieve its purpose. *Henderson v. Eastern Freight Ways, Inc.,* 460 F.2d 258, 260 (4th Cir.1972), *cert. denied,* 410 U.S. 912, 93 S.Ct. 976, 35 L.Ed.2d 275 (1973). Courts, applying this principle, generally do not dismiss prematurely filed Title VII suits when the right-to-sue letter issues after the suit begins. *See, e.g., Henderson,* 460 F.2d at 260; *Vanguard Justice Soc'y v. Hughes,* 471 F.Supp. 670, 686 (D.Md.1979) (non-Title VII suit amended to include Title VII claims, right-to-sue letter issued before end of statutory waiting period); *cf. Guerrero v. Reeves Bros. Inc.,* 562 F.Supp. 603 (W.D.N.C.1983) (Title VII suit dismissed without prejudice where right-to-sue letter would not be issued until end of statutory period, several months hence).

 Federal Express, on the other hand, argues that a Title VII suit must be dismissed where, as here, the plaintiffs were not entitled to receive the right-to-sue letter before the suit was initiated. Federal Express apparently distinguishes *Henderson* on the ground that the Title VII suit there was filed after the plaintiff became entitled to the right-to-sue letter, but before the letter actually issued. In support of this distinction, Federal Express relies on a line of cases holding that it is the entitlement to the right-to-sue letter, not the actual issuance of it by the EEOC, that is the necessary jurisdictional prerequisite to a Title VII suit. *See Perdue v. Roy Stone Transfer Corp.,* 690 F.2d 1091, 1093 (4th Cir.1982) (plaintiff, who met all

the other prerequisites for a right-to-sue letter, permitted to proceed with Title VII suit to enforce a conciliation agreement even though EEOC barred from issuing a right-to-sue letter after a conciliation agreement is reached); *Moore v. City of Charlotte,* 754 F.2d 1100, 1104 n. 1 (4th Cir.) (plaintiff permitted to maintain Title VII suit despite fact that right-to-sue letter issued by wrong government entity), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). Federal Express's reliance on these cases is misplaced and its effort to distinguish *Henderson* is unpersuasive. *Perdue* and *Moore* establish that entitlement to the letter is sufficient; a plaintiff is not required to have physical possession of a right-to-sue letter. This sensible principle, as well as the result reached here, give effect to the teaching of *Henderson* that Title VII be generously construed to achieve its important goal of providing a remedy for racial discrimination in employment. In sum, here, as in *Henderson,* both the waiting period and right-to-sue letter requirements have now been met. While the suits were filed prematurely, no good or sufficient reason exists to require dismissal at this late date. The objectives of the statutory prefiling requirements have been met; the EEOC, through the FCHRC, has now had the full time allotted to attempt conciliation. Moreover, plaintiffs can now maintain their actions even under *Perdue* and *Moore,* for by August 29, 1988, 180 days after House filed her complaint with the FCHRC, they became entitled to bring their law suits. Dismissing these suits at this late date, given their advanced stage of development, would result only in an inefficient waste of judicial resources.[26] As the jurisdictional defect created by the absence of the right-to-sue letters had been cured, the Magistrate appropriately permitted plaintiffs to

**26.** The recent decision in *Hallstrom v. Tillamook County,* —— U.S. ——, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) is inapposite. In *Hallstrom,* the Court held that a district court lacked subject matter jurisdiction to hear the plaintiff's suit against a violator of waste disposal regulations pursuant to the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6972, because the plaintiff did not notify the Environmental Protection Agency 60 days before filing suit as required by the RCRA. By contrast, the plaintiffs here did notify the FCHRC before they commenced their suits, but they failed to wait the requisite time. The subsequent issuance of the right-to-sue letters by the EEOC cured any jurisdictional defect.

amend their complaints. Given the principles enunciated in *Henderson,* this Court affirms the Magistrate's decision to allow the amendments and, likewise, denies Federal Express's companion motion for summary judgment.

### (3) Assertion of Claims Beyond Scope of Administrative Charges

In a final attempt to abate the Title VII claims, Federal Express asserts that White, House, and Boykins [27] should be strictly limited solely to the allegations of discrimination contained in the FCHRC charges.[28] Federal Express argues that a Title VII plaintiff may only assert those allegations contained in the scope of the administrative charge or developed in the course of the investigation of that charge. This argument is too narrow an interpretation of the case law. Federal Express correctly cites *King v. Seaboard Coast Line R.R.,* 538 F.2d 581, 583 (4th Cir.1976) for the proposition that only the "discrimination stated in the [EEOC] charge itself or developed in the course of a reasonable investigation of that charge" may be included in a subsequent suit by the EEOC. The *King* panel relied on *EEOC v. General Electric Co.,* 532 F.2d 359 (4th Cir.1976), which upheld a suit by the EEOC brought on both race and sex discrimination grounds following an investigation into charges that alleged only race discrimination. Federal Express's reliance on *King* and *General Electric* is misplaced; neither compels the Court to bar these plaintiffs' Title VII claims. Moreover, Federal Express's argument ignores the principle that Title VII is a remedial provision and should be broadly construed. *Henderson v. Eastern Freight Ways, Inc.,* 460 F.2d 258, 260 (4th Cir.1972), *cert. denied,* 410 U.S. 912, 93 S.Ct. 976, 35 L.Ed.2d 275 (1973). The

better-reasoned rule is that where, as here, the subsequent civil action was brought by the individual and not the EEOC, the allegations in the complaint need only be reasonably related to the administrative charges. *See Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973). This "reasonable relation" test balances the interests of both parties. It affords the defendant reasonable protection from the unfair surprise and prejudice of defending against claims in court that are unrelated to the administrative charge. At the same time, it permits the plaintiff to initiate the EEOC investigation without having to frame his charges in precise or legalistic detail.

Applied here, the "reasonable relation" test makes clear that all plaintiffs' claims are reasonably related to their FCHRC charges. Moreover, plaintiffs have submitted sworn affidavits that contain statements they submitted to the FCHRC as the basis of their charge. The FCHRC condensed these statements to form the formal charge. When read together, plaintiffs' statements contain essentially all the allegations in the present complaints. Even without these statements, the core of the plaintiffs' complaints can easily be deduced from their FCHRC charges. Federal Express has no basis for a claim of unfair surprise or prejudice. Accordingly, this abatement ground fails.

### (4) Summary Judgment on the Merits

As a threshold matter, summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact. The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading,

---

**27.** This defense is not raised against Allen.

**28.** Specifically, White would be limited to claims concerning his discharge, the refusal to assign him to light duty, racial slurs, and a December, 1988 application for the dispatchers position. House would be limited to allegations of racial slurs and an unsatisfactory performance review. Boykins would be limited to allegations of discriminatory discharge, racial slurs,

an oral warning for unsatisfactory conduct, and a poor performance review.

White's reference to a December 1988 application for the dispatcher position appears on his FCHRC complaint but is apparently an error. Federal Express's records indicate that the last time White applied for a dispatchers position was November, 1987. And White was discharged by Federal Express in August, 1988.

but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc.*, 840 F.2d 236 (4th Cir.1988). Further, the movant need not negate his opponent's case; he need only disclose the absence of evidence to support that case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Bell v. Arlington County*, 673 F.Supp. 767, 768 (E.D.Va. 1987). With these standards as a lens, the Court now focuses separately on the merits of the disparate treatment claims and the hostile environment claims.

### (a) Disparate Treatment Claims

■■■■■■■ In Title VII disparate treatment cases, as in other civil cases, plaintiffs have the burden of establishing their case by a preponderance of the evidence. *Moore v. City of Charlotte*, 754 F.2d 1100, 1104–05 (4th Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). As part of their case, the plaintiffs must show that Federal Express's actions were motivated by discriminatory intent. *Autry v. North Carolina Dept. of Human Resources*, 820 F.2d 1384, 1385 (4th Cir.1987). This may be done by direct evidence, or, because proving discriminatory intent may be difficult, it may be done by circumstantial evidence. In the latter event, a shifting burdens analysis applies. This analysis is well-settled:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimina-

tion. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

> *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted).

■■■■■■ The facts necessary to show a prima facie case vary slightly with the exact nature of the disparate treatment, but all follow a basic model: (1) the plaintiff must show that he is a member of a protected class, (2) the plaintiff's conduct must have been comparable to that of another employee from a different race, and (3) the two employees must have been treated disparately.[29] *See Moore*, 754 F.2d at 1106.

■■■■■ This litigation is presently at a stage where the plaintiffs have set out sufficient facts to establish a prima facie case for each disparate treatment claim. Federal Express, in each case, has also put forward a legitimate, non-discriminatory reason for its actions. The plaintiffs, therefore, are now entitled to demonstrate that Federal Express's stated reasons are pretextual rather than legitimate. Summary judgment on this issue, however, is not appropriate, for a material fact, *i.e.*, wheth-

---

**29.** Specifically, in order for White, Allen, and Boykins to establish a prima facie case that their discharges represent disparate discipline, they must show: (i) that they engaged in prohibited conduct similar to that of a person of another race and (ii) that disciplinary measures enforced against them were more severe than those enforced against that other person. *Dwyer v. Smith*, 867 F.2d 184, 190 (4th Cir. 1989); *Moore*, 754 F.2d at 1105–06. For White and House to show that the denial of their job transfer requests were discriminatory, they must show (i) that they applied and were qualified for a job for which Federal Express was seeking applicants, (ii) that, despite their qualifications, they were rejected; and (iii) that, after

their rejection, the position remained open and Federal Express continued to seek applicants from persons with their qualifications. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Similarly, for House to show that she received a discriminatory performance review, she must demonstrate (i) that she did comparable work to that of a different employee of another race and (ii) that her performance was rated below that of the other employee. Finally, for White to show that his non-assignment to light duty represented disparate treatment, he must show (i) he was injured, and (ii) similarly injured employees of a different race were given light duty.

er Federal Express's nondiscriminatory reasons are a pretext for discrimination, is genuinely disputed. It is, in part, a credibility issue requiring that the trier of fact hear the evidence and observe the witnesses before it can be resolved. Relevant, too, are such matters as plaintiffs' allegations of a pattern racial harassment at Federal Express, any statistical data on disciplinary practices or job assignments, and whether the managers who made the decisions in issue believed the reasons they put forward. *See Warren v. Halstead Indus.*, 802 F.2d 746, 753 (4th Cir.1986), *rev'd in part, aff'd in pertinent part,* 835 F.2d 535 (4th Cir.) (*en banc*) (*per curiam*), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2872, 101 L.Ed.2d 907 (1988). Federal Express has failed to demonstrate an absence of evidence on these matters; thus summary judgment is not appropriate.[30]

(b) Hostile Racial Environment

■■■■ A "hostile environment" is actionable under Title VII. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (environment made hostile by pattern of sexual harassment); *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971) (in ethnic harassment context), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). But not all work place conduct that could be described as "harassment" is actionable. Such conduct must be "sufficiently severe and pervasive" so as to "create an abusive working environment". *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (citations omitted); *see also Spencer v. General Electric Co.,* 697 F.Supp. 204, 217–19 (E.D.Va.1988), *aff'd,* 894 F.2d 651 (4th Cir.1990). Moreover, this cause of action is not limited solely to claims of economic harm, but addresses all harms that arise from a hostile work environment. *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404.

■■■ Federal Express urges that summary judgment on each plaintiff's claim of a racially hostile environment is appropriate because collectively the plaintiffs have alleged only two incidents of racial epithets as the basis for their claim.[31] Federal Express argues that these incidents were isolated and, more importantly, did not involve management. In fact, Federal Express asserts that management promptly addressed these incidents. The motion for summary judgment fails, however, because in considering the totality of the allegations and evidence, it cannot be said that the plaintiffs will be unable to establish their claim at trial. Racial epithets are not all that can establish a claim for hostile environment. Plaintiffs also assert discrimination in shift assignments, route assignments, and collateral duties. They assert that black employees are written up and disciplined for minor rules violations. And they assert that black employees are refused light duty when injured and are not permitted to split heavy loads between drivers. All these allegations go to the creation and maintenance of a racially hostile environment in addition to, and apart from, racial slurs. The fact that many of these allegations also involve the plaintiffs' disparate treatment claims does not disqualify them from supporting their racially hostile environment claims. The term "environment" is one of inclusion; it includes the entire universe of plaintiffs' relations with Federal Express. While standing in isolation, each disparate treatment claim or epithet may seem *de minimis,* when viewed together they may be sufficiently pervasive and oppressive so as to create a racially hostile environment. Resolution of plaintiffs' claims, therefore, will have to await trial on the merits.

*Conclusion*

Summary judgment for defendant is warranted with respect to plaintiffs' § 1981

---

**30.** Federal Express's authorities are inapposite as they involve situations where plaintiffs, unlike the instant plaintiffs, failed to establish a prima facie showing. *See Goldberg v. B. Green & Co.,* 836 F.2d 845 (4th Cir.1988); *Ballinger v. North Carolina Agr. Ext. Service,* 815 F.2d 1001 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987).

**31.** The record shows that one white employee threatened to "slap the black off" the face of a black courier after that courier radioed in and threatened to "scrape some of the white" off the white employee's car if she did not move it. Plaintiff Boykins also alleges that he has been called "nigger" by white coworkers on at least two occasions.

and pendent state claims, but not for their Title VII claims. Those require trial. An appropriate order has issued.