**Brenda PATTERSON, Plaintiff,**

**v.**

**McLEAN CREDIT UNION, Defendant.**

**No. C–84–73–WS.**

United States District Court,
M.D. North Carolina,
Winston–Salem Division.

Feb. 18, 1992.

Harold L. Kennedy, III of Kennedy, Kennedy, Kennedy & Kennedy, Winston–Salem, N.C., for plaintiff.

George E. Doughton, Jr., H. Lee Davis, Jr. and Thomas J. Doughton of Hutchins, Tyndall, Doughton & Moore, Winston–Salem, N.C., for defendant.

## MEMORANDUM OPINION AND ORDER

HIRAM H. WARD, Senior District Judge.

This matter comes before the Court on remand from the Fourth Circuit Court of Appeals. In its most recent opinion in this case, *Patterson v. McLean Credit Union*, No. 90–1729, 1991 WL 68811 (4th Cir. May 3, 1991) (per curiam) [931 F.2d 887 (table)], the Court of Appeals instructed this Court to reconsider plaintiff's refusal-to-promote claim brought under 42 U.S.C. § 1981 after she should have the opportunity to "advance legal arguments as to the sufficiency of the existing or any additional evidence to establish her 'new contract' claim." *Id.*, slip op. at 8. Defendant has moved for summary judgment, the parties have been afforded additional time for discovery, and the parties' positions have been fully briefed. Thus, the matter is ripe for a ruling, and the Court, consistent with the opinion offered below, will grant defendant's Motion for Summary Judgment.

## I. Procedural History

Prior to the appeal and remand described above, this case traveled extensively in the federal court system. This Court's prior opinion in the case, *Patterson v. McLean Credit Union*, 130 F.R.D. 617 (M.D.N.C. 1990), was the source of the appeal mentioned above. When last before this Court, the case was on remand from the Fourth Circuit Court of Appeals, *Patterson v. McLean Credit Union*, 887 F.2d 484 (4th Cir. 1989), where the case was, in turn, on remand from the United States Supreme Court, *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In its opinion, the Supreme Court stated that a promotion claim is actionable under § 1981 if "the nature of the change in position [contemplated by the promotion] was such that it involved the opportunity to enter into a new contract with the employer." *Id.* at 185, 109 S.Ct. at 2377. Thus, after having traveled initially from a jury verdict and an opinion of this Court to the Supreme Court, the case made its way back here where it was dismissed on the pleadings then available. On the further direction of the Court of Appeals, the case is before this Court again.

## II. Factual Background

Plaintiff, a black female, was hired by defendant in 1972 as a teller and file coordinator. Her job position and title, Account Junior, remained unchanged during her time with defendant. She was always paid on an hourly wage basis. Susan Williamson, a white employee hired as an accounting clerk in 1974, received a title change from "Account Junior" to "Account Intermediate" in 1982. Plaintiff asserted that the title change was a promotion and that she herself should have received such a promotion due to her seniority over Williamson. The title change was accompanied by a pay increase of 89 cents per hour more than Patterson's pay shortly thereafter. Williamson remained at the same desk under the same supervision as she had before the title change.

With additional discovery, plaintiff now makes several assertions which should be noted. First, plaintiff states that the change to Account Intermediate would have produced eighteen different job duties for her. These include the following: (1) reconciling bank statements; (2) preparing Regulation "G" worksheets and reports; (3) preparing monthly work sheets for Branch Income and Expense Report; (4) entering ready credit lines into system; (5) preparing weekly cash on hand reports; (6) preparing Regulation "D" report; (7) maintaining subsidiary ledgers on ICU and Federal Funds; (8) receiving bank figures and calling in wire transfers; (9) auditing computer reports; (10) entering any add-on expenses (to loans) and entry reversal into system; (11) entering write-offs each quarter into system; (12) preparing listing of checks used for bank; (13) filing or distributing daily computer reports; (14) preparing entry for all returned checks for supervisor; (15) balancing weekly CD report to general ledger; (16) checking out, distributing, or filing weekly computer reports; (17) checking out, distributing, or filing monthly computer reports; and (18) inputting branch work daily. (Williamson Deposition, Exhibit 3).

The record also indicates that plaintiff's duties as an Account Junior were as follows: (1) pulling paid loans to be mailed and filing unmailed paid loan information in inactive file cabinets; (2) filing insurance papers and titles for auto and unit loans on a daily basis; (3) preparing information for typing insurance cancellation letters for auto and unit loans and typing letters; (4) filing all loans after they have been reviewed and preparing folders; (5) analyzing auto and unit loans to determine which ones needed insurance and/or title letters and typing letters; (6) filing branch input forms and documents; (7) pulling all loan folders requested and accounting for pulled folders; (8) filing payroll authorization forms; (9) processing all requests for copies of statements and/or drafts; (10) shredding any confidential paperwork. (Plaintiff's Motion to Compel Discovery and for Sanctions, Exhibit A at 7).

Plaintiff also states that she would have received a substantial pay increase in the position of Account Intermediate. As sup-

port, she compares the minimum salary of an Account Junior, $4.00 per hour, to the maximum salary of an Account Intermediate, $9.75 per hour. Plaintiff's own Trial Exhibits disclose a different picture. The position of Account Intermediate afforded Susan Williamson an hourly wage of $8.23 while plaintiff's position paid her $7.34 only a few short months after Williamson's title and duties were changed—a difference of eighty-nine cents per hour. (Pay Record of Brenda Gail Patterson, Plaintiff's Trial Exhibit 4; and Pay Record of Susan Tengen Williamson, Plaintiff's Trial Exhibit 7). With regard to pay, plaintiff also states that her position on defendant's pay scale, denominated H01, would have been changed to H06. No evidence of corresponding pay values or gradations is offered in conjunction therewith.

Plaintiff next states that, as an Account Junior, her duties were confined to intrastate commerce and were not, therefore, subject to the Fair Labor Standards Act. Because the Account Intermediate position dealt with the transfer of funds in interstate commerce, plaintiff believes that this position would have been covered by the Fair Labor Standards Act. Plaintiff offers no support for this argument and fails to describe how this would have created a new and distinct relationship between her and her employer.

Next, plaintiff states that she would have had the opportunity for higher advancement in the company had she been changed to the position of Account Intermediate. Plaintiff also states that she did not have a computer terminal, a telephone, or an adding machine in the vault where she worked while Williamson had access to these types of machines. Finally, plaintiff states that she was rarely allowed to work overtime while Williamson was allowed to do so.

Having outlined plaintiff's position for the purpose of examining her claim under the summary judgment standard, it is necessary to mention another issue plaintiff raises due to the passage of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071. Plaintiff argues that the provisions of the Civil Rights Act of 1991 should be applied retroactively to her case. Because it is necessary to determine what law is to be applied to plaintiff's case before it can be determined whether she has stated a genuine issue of material fact under that law, the Court will first examine the applicability of the Civil Rights Act of 1991 to this case.

### III. Civil Rights Act of 1991

The Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, was passed into law on November 21, 1991. It is divided into four titles: I—Federal Civil Rights Remedies, II—Glass Ceiling, III—Government Employee Rights, and IV—General Provisions. The preamble to the Act states:

> An Act to amend the Civil Rights Act of 1964 to strengthen and improve Federal civil rights laws, to provide for damages in cases of intentional employment discrimination, to clarify provisions regarding disparate impact actions, and for other purposes.

Preamble, 105 Stat. at 1071. Thus it was the intention of Congress to alter the present picture of civil rights decisional law. This effort was inspired, at least in part, by the decisions coming from the claims originally brought by plaintiff in this case years ago as evidenced by the changes to section 1981. *See* 137 Cong. Rec. S15483 (daily ed. October 30, 1991).

Former section 1981 provided:

> All persons within the jurisdiction of the United States shall have the same rights in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. Rev.Stat. § 1977.

42 U.S.C. § 1981 (1988).

Congress has changed section 1981 by placing the letter "(a)" before the section quoted above and by adding the following new subsections:

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of state law.

§ 101, 105 Stat. at 1071–72. Without attempting to interpret the meaning of these new sections, it appears to the Court that, in the abstract, they could have an impact on a case such as plaintiff's, should they be applied retroactively.[1] However, the Court believes that retroactive application of this statute would be incorrect given the effective date provisions of the statute and relevant case law.

## A. The Statute and the Legislative History

Before presenting this Court's reasoning on the matter, an examination of the opinions of other courts which have already considered the retroactive application of the Act is in order. It appears that the Act has been applied retroactively in as many as nine cases while retroactive application has been rejected in as many as six others. The Act was not applied retroactively in *James v. American International Recovery, Inc.*, No. 89–CV–321–RHH, 1991 WL 281734 (N.D.Ga. Dec. 3, 1991); *Alexandre v. Amp Inc.*, 57 Fair Empl.Prac.Cas. (BNA) 768, 1991 WL 322947 (W.D.Pa. Dec. 5, 1991); *Van Meter v. Barr*, 778 F.Supp. 83 (D.D.C.1991); *Hansel v. Public Service Co. of Colorado*, 778 F.Supp. 1126 (D.Col.1991); *Khandelwal v. Compuadd Corp.*, 780 F.Supp. 1077 (E.D.Va.1992); and *Burchfield v. Derwinski*, 782 F.Supp. 532 (D.Col. 1992). The courts in *James* and *Alexandre* did not offer their rationales for not applying the Act retroactively, and the court in *Van Meter* did not apply the Act retroac-

tively for reasons not applicable to the present situation. The court in *Hansel,* following the precedent of its Circuit Court of Appeals, reasoned that the absence of clear language in the statute and a confusing legislative history precluded retroactive application. 778 F.Supp. at 1136–37. Citing *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991), which held that a statute would apply retroactively to pending cases only if there is clear congressional intent to that effect, the district court in *Hansel* found first that the language of section 402 "does not facially express *clear* congressional intent to apply the Act retroactively to cases such as this one." *Hansel,* at 1136 (emphasis original). Then, because the legislative history "confirms that Congress was anything but clear on whether the Act would apply to pending cases[,]" the court held that the Act could not be applied retroactively under *DeVargas. Id.* 778 F.Supp. at 1136–37. The court in *Khandelwal* also reasoned that the Act itself and the legislative history would not lend themselves to a solution of the problem, but the Supreme Court's recent pronouncement in *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), required that the Act not be applied retroactively.[2] *Khandelwal,* at 1078–79.

The Act was retroactively applied in *Cary v. CHA*, No. 87–C–6998, 1991 WL 274443 (N.D.Ill. Dec. 13, 1991); *Thakkar v. Provident National Bank*, No. 90–3907, 1991 WL 274827 (E.D.Pa. Dec. 17, 1991); and *La Cour v. Harris County*, 57 Fair Emp.Prac. Cases 622, 1991 WL 321020 (S.D.Tx. Dec. 6, 1991). In each of these cases, the courts applied the Act retroactively without in depth consideration of the language or legislative history of the Act. The Act was also retroactively applied in *King v. Shelby Medical Center*, 779 F.Supp. 157 (N.D.Ala.1991); *Mojica v.*

---

**1.** As a practical matter, though, based upon the trial evidence as to the respective qualifications of Williams and plaintiff, a claim by plaintiff under the new sections quoted above would also surely fail.

**2.** This Court will consider the applicable case law in the next section of this opinion.

*Gannett Co.,* 779 F.Supp. 94, 57 Fair Empl. Prac.Cas. (BNA) 537 (N.D.Ill.1991)[3]; *Stender v. Lucky Stores, Inc.,* 780 F.Supp. 1302 (N.D.Cal.1992); and *Goldsmith v. City of Atmore,* 782 F.Supp. 113 (S.D.Ala.1992). In *Mojica v. Gannett Co.,* 779 F.Supp. 94, 57 Fair Empl.Prac.Cas. (BNA) 537 (N.D.Ill. 1991), the court followed the lead of its Court of Appeals in applying the Act retroactively primarily via a consideration of the case law concerning retroactive application of statutes generally. Citing *Federal Deposit Ins. Corp. v. Wright,* 942 F.2d 1089 (7th Cir.1991), the court in *Mojica* quoted the appellate court's decision to follow the Supreme Court's line of authority found in *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), by which a statute is applied retroactively unless to do so would threaten manifest injustice or there is evidence of congressional intent to the contrary. Finding the language of the statute and the legislative history inconclusive, the court went on to examine the case under the relevant precedent. *Mojica,* 779 F.Supp. at 97–98, 57 Fair Empl.Prac.Cas. at 539. The court in *King* felt that it was bound by precedent in its circuit similar to that in *Mojica.* The court in *Stender* argued that the statute's plain language and the legislative history require that the Act be applied retroactively as does relevant case law.

As the Supreme Court has stated, "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Com. v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *See also Lynch v. Alworth–Stephens Co.,* 267 U.S. 364, 370, 45 S.Ct. 274, 275–76, 69 L.Ed. 660 (1925) ("the plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an

acute and powerful intellect could discover." (citation omitted)).

Title IV, General Provisions, Civil Rights Act of 1991, contains section 402 entitled "Effective Date." It reads as follows:

(a) IN GENERAL.—Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment.

(b) CERTAIN DISPARATE IMPACT CASES.—Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983.

§ 402, 105 Stat. at 1099.

Section (a) states "Except as otherwise specifically provided. . . ." A review of the Act as a whole and with particular attention to the changes made to section 1981 discloses that there is no section dealing specifically with the effective date of new section 1981, that is—no exception to section 402 for section 1981. Thus, the Court must look to the general effective date provision. The plain meaning of section 402(a) is that the Act shall have no retroactive effect. Each phrase or word, "take effect," "upon," and "enactment" must be examined in turn.

*Black's Law Dictionary* defines the phrase "take effect" to mean "to become operative or executed. To be in force, or go into operation." *Black's Law Dictionary* 1304 (5th Ed.1979). Black's also states that the phrases " 'take effect,' 'be in force,' and 'go into operation, etc.' are used interchangeably." *Id.* at 462. *Webster's Dictionary* defines the phrase "take effect" to mean "to become operative . . . to produce a result." *Webster's Third New International Dictionary.* 2331 (1972). Thus, in both the lawyer's and the layperson's dictionaries, the phrase "take effect" denotes a beginning point from which action will occur, a starting point prior to

---

**3.** Two other courts of the Northern District of Illinois have since followed the Court in *Mojica.* See *Graham v. Bodine Electric Co.,* 782 F.Supp. 83 (N.D.Ill.1992); and *Bristow v. Drake Street, Inc.,* No. 87 C 4412, 1992 WL 14262 (N.D.Ill. Jan. 21, 1992).

which the contemplated action did not occur.

"Upon" is defined as "on." *Id.* at 2517. "On" is defined variously, but its most relevant definition is as a "function word to indicate position with regard to ... time...." *Id.* at 1574. Specifically, it is described as an "occurrence during the course of a specified day...." *Id.*

Finally, "enactment" is defined as "the method or process by which a bill in the Legislature becomes a law." *Black's Law Dictionary* 472 (5th Ed.1979). Webster's defines the word via its entry for "enact" which states "to enter into the public records, ..., to establish by legal and authoritative act: make into a law...." *Webster's Third New International Dictionary* 745 (1972).

Combining these definitions, the four words, "take effect upon enactment," must be interpreted to indicate a beginning point, November 21, 1991 [the date the President signed the bill into law], from which date the Act and its amendments would be operative on events coming within their scope, but having no effect on events occurring before that date as the Act was not operative prior to November 21, 1991. The language of the statute provides no indication that Congress intended retroactive application of the Act, and the Court will not read such a requirement into the statute.

The Court is aware that other courts, noted earlier, have believed that the language of section 402 is inconclusive as to the issue of retroactivity.[4] However, as the Supreme Court has directed, the plain meaning of a statute controls. *See Lynch v. Alworth–Stephens Co.*, 267 U.S. 364, 370, 45 S.Ct. 274, 275–76, 69 L.Ed. 660 (1925). The plain meaning of this statute is that the Act had no effect prior to November 21, 1991. Thus, it cannot be construed to govern events occurring prior to that time.

■ Plaintiff makes an argument based on the negative inference she draws from § 402(b) and § 109(c). Section 109, entitled "Protection of Extraterritorial Employment", contains a subsection (c) which states: "The amendments made by this section shall not apply with respect to conduct occurring before the date of the enactment of this Act." § 109, 105 Stat. at 1078. Plaintiff argues that, because § 109(c) specifically precludes retroactivity and § 402(b) specifically excludes certain cases from application of the Act, Congress must have considered retroactive application of the Act. She continues: by failing to specifically prohibit retroactive application of the Act as in sections 109(c) and 402(b), Congress must have intended that the remaining portions of the Act (other than § 109(c)) be applied retroactively to the re-

---

**4.** The Court is in agreement with those other courts which have considered the issue as to the clarity of the legislative history on this matter: there is no clarity. The two political parties appear to have split along party lines on the issue, leaving the matter for the courts to decide.

For example, in the Senate, an Interpretive Memorandum representing the views of many of the Republican sponsors of the bill stated with regard to retroactivity:

The bill provides that, unless otherwise specified, the provisions of this legislation shall take effect upon enactment *and shall not apply retroactively.*

137 Cong.Rec. S15485 (Oct. 30, 1991) (emphasis added). In response, Senator Kennedy, representing the Democratic sponsors stated:

It will be up to the courts to determine the extent to which the bill will apply to cases and claims that are pending on the date of enactment. Ordinarily, courts in such cases apply newly enacted procedures and remedies to

pending cases. That was the Supreme Court's holding in *Bradley v. Richmond School Board*, 416 U.S. 696 [94 S.Ct. 2006, 40 L.Ed.2d 476] (1974).

And where a new rule is merely a restoration of a prior rule that had been changed by the courts, the newly restored rule is often applied retroactively, as was the case with the Civil Rights Restoration Act of 1988. That was what the courts have held in *Leake v. Long Island Jewish Medical Center*, 695 F.Supp. 1414 (E.D.N.Y.1988), *aff'd*, 869 F.2d 130 (2d Cir.1989), *Ayers v. Allain*, 893 F.2d 732 (5th Cir.1990), and *Bonner v. Arizona Department of Corrections*, 714 F.Supp. 420 (D.Ariz. 1989). But see *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377 (10th Cir. 1990). It was with that understanding that I agreed to be the principal Democratic sponsor of the Danforth–Kennedy substitute.

137 Cong.Rec. S15485 (Oct. 30, 1991). *See also* 137 Cong.Rec. H9530–31, H9548, and H9549 (Nov. 7, 1991).

maining body of pending case law (other than that excluded by § 402(b)).

This negative inference drawn by plaintiff would seem to be the sort of "curious, narrow, hidden sense" of a statute that the Supreme Court has sought to avoid. *Lynch v. Alworth–Stephens Co.*, 267 U.S. 364, 370, 45 S.Ct. 274, 275–76, 69 L.Ed. 660 (1925). Congress did clearly consider the retroactive application of the statute. That is the purpose of § 402(a) which, again, states that the Act shall take effect upon enactment.

Even if the language of the statute were not clear on its face, and despite the fact that Congress provided little aid on this issue, current case law on this subject requires that the Act not be applied retroactively.

## B. Case Law

### 1. The Supreme Court

 "Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). Of those cases in which the Supreme Court has actually considered the merits of retroactive application of legislation, this is its most recent pronouncement. The Court went on to state: "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* (citations omitted).

> "The power to require readjustments for the past is drastic. It ... ought not to be extended so as to permit unreasonably harsh action without very plain words." Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.

*Id.* at 208–09, 109 S.Ct. at 471 (citing *Brimstone R. Co. v. United States*, 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1927)).

More recently, in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), the Court recognized the split in its previous opinions between *Bowen* and a line of cases including *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), and *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). *Kaiser*, 494 U.S. at 836–39, 110 S.Ct. at 1576, 108 L.Ed.2d at 853–54. The Court declined to reconcile the split between the two lines of authority because the plain language of the statute disclosed clear congressional intent that the changed statute not be applied retroactively. 494 U.S. at 837–39, 110 S.Ct. at 1577, 108 L.Ed.2d at 854. Of particular importance, however, is Justice Scalia's concurring opinion in *Kaiser* analyzing the history of the concept of retroactivity in the law and concluding that the Court should reconcile the existing tension in favor of non-retroactivity. 494 U.S. at 840–59, 110 S.Ct. at 1579–88, 108 L.Ed.2d at 856–67 (Scalia, J., concurring).

Because a more complete picture of the history of and the arguments against retroactive application of statutory law cannot likely be found, this Court will only point out a few salient passages from Justice Scalia's argument.

> Since the issue has been briefed and argued in this case, I would have taken the occasion to admit that the rule we expressed in *Thorpe* and *Bradley* was wrong, and to reaffirm the clear rule of construction that has been applied, except for these last two decades of confusion, since the beginning of the Republic and indeed since the early days of the common law: absent specific indication to the contrary, the operation of nonpenal legislation is prospective only. (footnote omitted).

494 at 841, 110 S.Ct. at 1579, 108 L.Ed.2d at 856 (Scalia, J., concurring).

> During these more than 150 years of doctrinal certainty [prior to *Thorpe*], we did not always deny retroactive application to new statutory law. But when we accorded it, the reason was that the stat-

ute affirmatively so required. (citations omitted).

494 U.S. at 844, 110 S.Ct. at 1580, 108 L.Ed.2d at 858 (Scalia, J., concurring).

[Retroactivity] is contrary to fundamental notions of justice, and thus contrary to realistic assessment of probable legislative intent. The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal. It was recognized by the Greeks, *see* 2 P. Vinogradoff, *Outlines of Historical Jurisprudence* 139–40 (1922), by the Romans, *see* Justinian Code, Book 1, Title 14, § 7, by English Common Law, *see* 3 H. Bracton, *De Legibus et Consuetudinibus Angliae* 531 (T. Twiss trans. 1880); Smead 20 *Minn.L.Rev.*, at 776–778, and by the Code Napoleon, 1 Code Napoleon, Prelim. Title, Art. 1, cl. 2 (B. Barrett 2 trans. 1811). It has long been a solid foundation of American law. Chancellor Kent said that "it cannot be admitted that a statute shall, by any fiction or relation, have any effect before it was actually passed." 1 J. Kent, Commentaries on American Law *455. Justice Story said that "retrospective laws are ... generally unjust; and ... neither accord with sound legislation nor with the fundamental principles of the social compact." J. Story, Commentaries on the Constitution § 1398 (1851). The United States Constitution itself so far reflects these sentiments that it proscribes all retroactive application of punitive law, U.S. Const, Art. I, § 9, cl. 3, see *Calder v. Bull*, 3 Dall 386, 1 L.Ed. 648 (1798), and prohibits (or requires compensation for) all retroactive laws that destroy vested rights.... (citations omitted).

494 U.S. at 855–56, 110 S.Ct. at 1586–87, 108 L.Ed.2d at 865–66 (Scalia, J., concurring).

Little more can or need be said against retroactive application of a statute, but a review of Supreme Court case law in favor of retroactive application of new legislation is in order.

Both *Bradley* and *Thorpe* find their genesis in *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). Chief Justice Marshall delivered the opinion of the Court.

[I]f, subsequent to [a] judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.... It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns, where individual rights, acquired by war, are sacrificed for national purposes, the contract making the sacrifice ought always to receive a construction conforming to its manifest import....

*Schooner Peggy*, 5 U.S. (1 Cranch) at 110. In *Schooner Peggy*, the plaintiffs had captured a French schooner, Peggy, the cargo of which they hoped to keep. The district court would not have allowed them to do so, the Court of Appeals reversed, and, in the mean time, the President signed a convention with France stating that captured property of this sort would be mutually restored. *Id.* at 103–08. The Supreme Court applied the law retroactively to the case. *Id.*

More than 150 years later, in *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) the next major decision involving retroactivity was handed down when the Court retroactively applied an administrative decision requiring that a tenant in a public low-rent housing project be advised of the reasons for eviction. Quoting from *Schooner Peggy*, the Court noted that an exception had been made to the general rule that new statutes should not be applied retroactively where to do so would result in manifest injustice. *Thorpe*, 393 U.S. at 282, 89 S.Ct. at 526. Here, no such "manifest injustice" occurred since requiring the defendant Housing Authority to give this plaintiff the reasons for eviction would enable the plaintiff to properly defend himself against the eviction while not infringing on any of the

defendant's rights. *Id.* at 282–83, 89 S.Ct. at 526–27. In fact, the defendant had already begun to comply with the requirement in later cases. *Id.*

The final major case applying new legislation retroactively is *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). There, the Court retroactively applied a statute dealing with attorney's fees, citing *Schooner Peggy* and *Thorpe* and rejecting the "contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature." *Bradley,* 416 U.S. at 715, 94 S.Ct. at 2018 (footnote omitted). The Court further stated, "While neither our decision in *Thorpe* nor our decision today purports to hold that courts must always thus apply new laws to pending cases in the absence of clear legislative direction to the contrary, we do note that insofar as the legislative history of § 718 [the statute at issue] is supportive of either position, (footnote omitted) it would seem to provide at least implicit support for the application of the statute to pending cases. (footnote omitted)." *Id.* at 715–16, 94 S.Ct. at 2018–19.

The Court perhaps expanded this area of the law somewhat in *Bradley* by further defining the elements of manifest injustice as centering upon "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Id.* at 717, 94 S.Ct. at 2019. As to the first element, the Court reasoned that the disparity in the abilities of the parties to protect their interests and the fact the desegregation issues at the heart of the case benefitted the community at large removed the case from the category of those cases between two private parties. *Id.* at 718, 94 S.Ct. at 2019–20. The second element, the nature of the rights involved, concerns whether retrospective application of the statute would "deprive a person of a right that had matured or become unconditional." (citations omitted) *Id.* at 720, 94 S.Ct. at 2020–21. This concern was not implicated in *Bradley* because the defendant, the Richmond school board, had no rights in the funds at issue. Finally, the third element, interpreted to mean whether "new and unanticipated obligations [might] be imposed upon a party without notice or an opportunity to be heard," was not implicated because retroactive application of the statute would not increase the school board's burden to provide a nondiscriminatory education. *Id.* at 720–21, 94 S.Ct. at 2020–21.

### 2. The Fourth Circuit Court of Appeals

Such being the picture of the law in the Supreme Court, it is necessary for this Court to review Fourth Circuit Court of Appeals precedent on the issue. The Fourth Circuit's most recent pronouncement follows the Supreme Court's decision in *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In *Leland v. Federal Insurance Administrator,* 934 F.2d 524 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991), the Court of Appeals stated that, in *Bowen,* "the Supreme Court recently reaffirmed the longstanding principles relative to the retroactive application of statutory enactments and administrative rulemaking and held that, even where some substantial justification for retroactivity is presented, courts should be reluctant to find such authority absent an express statutory grant." *Leland,* 934 F.2d at 528. (citation omitted).

Of course, the Court of Appeals has applied the *Bradley—Thorpe* line of cases. *See United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988); *Hyatt v. Heckler,* 757 F.2d 1455 (4th Cir.1985); *National Posters, Inc. v. NLRB,* 720 F.2d 1358 (4th Cir.1983); and *Alphin v. Henson,* 552 F.2d 1033 (4th Cir.), *cert. denied, Henson v. Alphin,* 434 U.S. 823, 98 S.Ct. 67, 54 L.Ed.2d 80 (1977). This Court's research also discloses, however, a number of cases in which the Court of Appeals has sought to limit the application and even the interpretation of the *Bradley* rule.

In *Condit v. United Air Lines, Inc.,* 631 F.2d 1136 (4th Cir.1980), the plaintiffs sought the retroactive application of the Pregnancy Discrimination Act per the *Bradley* rule. The Court of Appeals stat-

ed: "it occurs to us that they [the plaintiffs] are, in fact, seeking retroactive operation of this law to impose liability upon United growing out of activities which occurred in 1972, some seven years prior to the Act." *Condit,* 631 F.2d at 1139–40. The statute's language regarding effective date, much like that presently at issue, read:

> Sec. 2(a) Except as provided in subsection (b), the amendment made by this Act shall be effective on the date of enactment.

*Id.* at 1140. Subsection (b) provided that the Act would have no effect on any fringe benefit program in effect on the date of enactment. *Id.* The Court, borrowing from the Eighth Circuit Court of Appeals, stated:

> The usual purpose of a special interpretive statute is to correct a judicial interpretation of a prior law which the legislature determines to be inaccurate. Where such statutes are given any effect, the effect is prospective only.

*Id.*

Next, in *United States v. Holcomb,* 651 F.2d 231 (4th Cir.1981), the Court of Appeals noted the *Bradley* rule and the fact that the Court followed that general rule, "applying to pending cases procedural changes that do not affect substantive or vested rights." 651 F.2d at 234, citing *Koger v. Ball,* 497 F.2d 702, 706 (4th Cir. 1974) ("Procedural statutes that affect remedies are generally applicable to cases pending at the time of enactment. (footnote omitted). Of course, retrospective application is not allowed when it will work a manifest injustice by destroying a vested right."). *See also Varandani v. Bowen,* 824 F.2d 307, 313 (4th Cir.1987), *cert. dismissed, Varandani v. Bowen,* 484 U.S. 1052, 108 S.Ct. 1000, 98 L.Ed.2d 968 (1988) (distinguishing *Thorpe* where regulation in question fixed an effective date whereas the regulation in *Thorpe* "merely stated that it superseded the prior regulation without specifying an effective date."); and *see Treadway v. Califano,* 584 F.2d 48 (4th Cir.1978) (Provisions of Black Lung Benefits Reform Act would not be applied

retroactively to detriment of coal miners when entire purpose of Act was to aid that group).

The Court of Appeals has also applied the "manifest injustice" exception of the *Bradley* line of cases. In *Hughes v. Heyl & Patterson, Inc.,* 647 F.2d 452 (4th Cir. 1981), the Court was faced with the issue of whether to apply retroactively a new definition of the term "operator" under the Black Lung Benefits Act, 30 U.S.C. §§ 901 *et seq.* (1980). To do so would have greatly expanded the body of persons potentially liable for violations of the Act. 647 F.2d at 454. "An operator is exposed to civil liability for violations of the health or safety standards of the act; therefore persons could be held liable for the violation of standards which they properly believed were not applicable to them at the time of their acts." *Id.* The Court therefore declined to apply the change retroactively. *Id.*

### 3. Analysis

Applying this body of precedent to the issue of whether to apply the Civil Rights Act of 1991 retroactively, it is clear to this Court that the current and overarching preference is to preclude such retroactive application. The Supreme Court's position in *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), is authority enough for that position. In addition, in its most recent pronouncement on the issue, the Fourth Circuit Court of Appeals has spoken approvingly of that position in *Leland v. Federal Insurance Administrator,* 934 F.2d 524 (4th Cir.), *cert. denied, Leland v. Federal Ins. Admr.,* —— U.S. ——, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991). By contrast, some degree of dissatisfaction with retroactive application of legislation can be gleaned from the Fourth Circuit's previous decisions on the matter. *See Condit v. United Air Lines, Inc.,* 631 F.2d 1136 (4th Cir.1980); *United States v. Holcomb,* 651 F.2d 231 (4th Cir.1981); *Koger v. Ball,* 497 F.2d 702 (4th Cir.1974); *Varandani v. Bowen,* 824 F.2d 307 (4th Cir.1987), *cert. dismissed, Varandani v. Bowen,* 484 U.S. 1052, 108 S.Ct. 1000, 98 L.Ed.2d 968 (1988);

*Treadway v. Califano,* 584 F.2d 48 (4th Cir.1978); and *Hughes v. Heyl & Patterson, Inc.,* 647 F.2d 452 (4th Cir.1981).[5]

When Justice Scalia's analysis from *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring), is added to the mix, the picture is made even clearer. Retroactive application of legislation is unfair, unfair to the citizenry making an attempt to guide its activities by the rule of law. To be forced to conduct one's life and one's business in the fear that a legislative body may later declare that conduct illegal is antithetical to the notions of justice and fair play that undergird our legal system. Of course, should Congress have decided that the Civil Rights Act of 1991 should be applied retroactively, this Court would have little choice but to follow that mandate. However, Congress put no such requirement in the statute, and this Court will not attempt to read one there.

It further appears to this Court that retrospective application of the Act would result in the manifest injustice contemplated as an exception to the *Bradley* line of cases. It is necessary to examine the nature and identity of the parties, the nature of their rights, and the nature of the impact of the change of law on these rights. *Bradley,* 416 U.S. at 717–18, 94 S.Ct. at 2019–20.

First, this is a case between two private parties. This is not a case between a school board and the children it educates as in *Bradley.* Though other courts have been influenced by the public interest and debate generated by this Act to believe that their decisions may have far-reaching impact, *see Mojica v. Gannett Co.,* 779 F.Supp. 94, 57 Fair Empl. Prac. Cas. (BNA) 537, 539 (N.D.Ill.1991), this Court is only able to decide the controversy between the two parties before it. This Court cannot decide the cases of parties not before it, in different places faced with other factual situations. There is no question that civil rights are of great importance, and this Court in no way seeks to limit those rights. However, non-retroactive application of the Civil Rights Act does not preclude plaintiff's claim as she still has the opportunity to make a claim under the previous section 1981 as will be examined in the next section. That determination, as well, will be between these two parties alone.

Second, the nature of the rights of these parties is such that they are matured in the sense that the law of this case has already been decided by the Supreme Court. The Supreme Court decided *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), more than two years ago, and the parties have a right to rely on that Court's interpretation of the law of their case. To place new legal requirements on the parties at this stage of a proceeding which has lasted more than seven years, involves conduct occurring a decade ago, and which has been before various courts of the federal system now seven times including a trial by jury would be patently unfair.

Third, by the same token, the impact of retroactive application of the Act would be to place new and unanticipated obligations on defendant. Again, these events occurred in the early 1980's and were governed by a law, section 1981, which, as the Supreme Court interpreted, did not apply to plaintiff's case except as to the creation of a new and distinct relationship between plaintiff and defendant. Defendant could not have anticipated that Congress, displeased with that interpretation, would change the law to fit the case. It would be "manifestly unjust" to apply this new standard to such a situation.

In sum, this Court believes that the statute itself precludes retroactive application as does the pertinent case law. Even if it did not, it would be plainly inequitable to do so. As Justice Scalia stated:

---

**5.** More specifically, the changes made to section 1981 appear to be substantive rather than procedural as in *Holcomb,* 651 F.2d at 234, and *Koger,* 497 F.2d at 706. Further, the Civil Rights Act of 1991 has an effective date like the regulation at issue in *Varandani* thereby distinguishing this case from *Thorpe* as well. 824 F.2d at 313.

Once one begins from the premise of *Thorpe* and *Bradley* that, contrary to the wisdom of the ages, it is not in and of itself unjust to judge action on the basis of a legal rule that was not even in effect when the action was taken, then one is not really talking about "justice" at all, but about mercy, or compassion, or social utility, or whatever other policy motivation might make one favor a particular result. A rule of law, designed to give statutes the effect Congress intended, has thus been transformed to a rule of discretion, giving judges power to expand or contract the effect of legislative action. We should turn this frog back into a prince as soon as possible.

*Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 857, 110 S.Ct. 1570, 1587, 108 L.Ed.2d 842, 866 (1990) (Scalia, J., concurring). This Court agrees that justice requires that legislation not be applied retroactively and so holds with regard to the Civil Rights Act of 1991.

### IV. Plaintiff's Failure-to-Promote Claim Under the Civil Rights Act of 1964

Plaintiff argues that even if the Civil Rights Act of 1991 does not apply to the instant case, plaintiff's "failure-to-promote" claim is actionable under the Civil Rights Act of 1964, as interpreted by the Supreme Court in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

### A. The Applicable Legal Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53,

91 L.Ed.2d 265 (1986). After the movant has met this burden, the nonmoving party may not rest on its pleadings, but must come forward with specific facts showing that evidence exists to support its claims and that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

In ruling on a motion for summary judgment, the Court must believe the evidence of the non-movant, and all justifiable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). However, in a case where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial' " and summary judgment is proper. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). In the instant case, defendant has moved for summary judgment. There being no genuine issues of material fact, the Court will grant defendant's motion.

### B. Patterson v. McLean Credit Union

■ In *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court first reaffirmed its holding in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), thereby making § 1981 applicable to the making and enforcement of private contracts in the context of an employment discrimination suit. However, Justice Kennedy, writing for the majority, sharply narrowed the scope of § 1981 in such cases, stating that by its plain terms § 1981 only involved the protection of two rights, "the same right . . . to make . . . contracts" and "the same right . . . to enforce contracts." 491 U.S. at 176, 109 S.Ct. at 2372. Justice Kennedy wrote:

[w]here an alleged act of discrimination does not involve the impairment of one of these specific rights, § 1981 provides no relief. Section 1981 cannot be construed as a general proscription of racial dis-

crimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts.

*Id.* (citations omitted). Justice Kennedy stated that the right to "make" a contract is narrow and:

> extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment. The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such post-formation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.

*Id.* at 176–77, 109 S.Ct. at 2372–73. Further, Justice Kennedy defined the right to "enforce" a contract as:

> a right of access to legal process, that will address and resolve contract-law claims without regard to race. In this respect, it prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race, and this is so whether this discrimination is attributed to a statute or simply to existing practices. It also covers wholly *private* efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations, as well as discrimination by private entities, such as labor unions, in enforcing the terms of a contract.

*Id.* at 177, 109 S.Ct. at 2373 (emphasis in original).

Accordingly, after *Patterson*, there exists a bright line distinction between pre-contract formation conduct and post-contract formation conduct. Generally, *Patterson* stands for two propositions: (1) that § 1981 precludes pre-contract formation conduct only when it involves the plaintiff's right to make a contract; and (2) that § 1981 precludes post-contract formation behavior only when it impairs the right to enforce a contract.

▪ In addition to the above rules, the Court also developed a special rule, consistent with the rules stated above, regarding discriminatory promotion practices. Justice Kennedy wrote:

> the question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter into a new contract is actionable under § 1981.

*Id.* at 185, 109 S.Ct. at 2377. The rationale underlying this rule is that, because discriminatory promotion practices may implicate the right to make a *new* employment contract, they fall within the "right ... to make ... contracts" language of § 1981, even though promotion practices constitute post-contract formation conduct which is unrelated to contract enforcement. Therefore, it is clear that after *Patterson*, some, but not all, promotion opportunities are cognizable under the statute.

In determining whether a promotion claim is actionable under § 1981, Justice Kennedy further stated that:

> a lower court should give a fair and natural reading to the statutory phrase "the same right ... to ... make contracts," and should not strain in an undue manner the language of § 1981. Only where the promotion rises to the level of an opportunity for a *new and distinct relation* between the employee and employer is such a claim actionable under § 1981.

*Id.* at 185, 109 S.Ct. at 2377 (emphasis added). The Court did not, however, provide much specific guidance on how to iden-

tify promotion opportunities that meet the "new and distinct relation" test. Instead, the Court simply cited, as its lone example of such a case, *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), where the defendant-law firm refused to accept an associate into partnership.

■ To summarize, after *Patterson*, employee claims based on work place racial harassment and/or disparate treatment that took place after the initial employment contract formation period and which does not involve contract enforcement or promotion are not cognizable under § 1981. As stated by Justice Kennedy, such cases are "more naturally governed by state contract law and Title VII." *Id.* 491 U.S. at 177, 109 S.Ct. at 2373.

### C. The Fourth Circuit Court of Appeals

The Fourth Circuit Court of Appeals most recently dealt with the failure to promote issue in *White v. Federal Express Corp.*, 939 F.2d 157 (4th Cir.1991), where the Court affirmed the analysis of the District Court of the Eastern District of Virginia in *White v. Federal Express Corp.*, 729 F.Supp. 1536 (E.D.Va.1990). The case involved the claims of a number of black employees who worked as couriers for Federal Express. Two of those plaintiffs brought claims under § 1981 alleging that they had been discriminated against when denied promotions. Plaintiff John White appealed the district court's entry of summary judgment on his § 1981 claim. White alleged that he had been denied a promotion to the position of dispatcher on three occasions and that white employees had been placed in the positions instead on all three occasions in violation of § 1981. 939 F.2d at 159. The Court of Appeals wrote with regard to the district court's analysis: "The district court thoroughly and, we find, correctly analyzed this issue." *Id.* (citation omitted).[6] Thus, a review of the district court's analysis is in order.

The district court began by noting that, at that time, the only relevant Fourth Circuit precedent was *Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908 (4th Cir.1989), where the Court had stated " 'promotion from a clerk to a supervisor [in a company's accounting department] with a consequent increase in responsibility and pay satisfies this [*Patterson*] test.' " 729 F.Supp. at 1545 (quoting Mallory, 882 F.2d at 910). As the district court noted, however, the Fourth Circuit did not elaborate on the criteria for the test. In its examination of the opinions of other Circuit Courts of Appeals, the district court discussed *Malhotra v. Cotter & Co.*, 885 F.2d 1305 (7th Cir.1989). There, in separate opinions, a Seventh Circuit panel proposed three interpretations of the "new and distinct relationship" test. The first centers on the contractual relationship between the employer and the employee and whether the change in position would result in a change in that contractual relationship ("the contract test"). 729 F.Supp. at 1545 (citing *Malhotra*, 885 F.2d at 1311). The second interpretation asks whether an outsider to the firm could fill the position ("the outsider test"). *Id.* (citing *Malhotra*, 885 F.2d at 1311). The third interpretation "focuses on whether the promotion would involve a substantial change in the plaintiff's job duties or responsibilities ("the job requirements test"). *Id.* (citing *Malhotra*, 885 F.2d at 1317 n. 6 (Cudahy, J., concurring)).

This Court agrees with the District Court of the Eastern District of Virginia where it states with regard to these three tests:

Of the three tests in the *Malhotra* opinions, the contract test is the most faithful interpretation of *Patterson*. It is clearly in line with the *Patterson* mandate to give § 1981 a "fair and natural reading". (citation omitted). *Malhotra's* proposed outsider and job requirements tests are too broad. These tests sweep within § 1981 not only true promotions, but also lateral transfers that merely involve new duties without significant changes in re-

---

**6.** A few months prior to its decision in *White*, the Court of Appeals had also noted with some approval the district court's analysis in *White* in the case of *Rountree v. Fairfax County School Bd.*, 933 F.2d 219 (4th Cir.1991).

sponsibility and pay. But it is the significant changes in responsibilities and pay, cited in *Mallory* and implicit in the promotion in *Hishon,* that form the heart of any new contract between an employee and an employer.... Moreover, any anomaly created by application of this test is mitigated by an employee's right to bring suit under Title VII. *See Patterson,* 109 S.Ct. at 2374 (Supreme Court recognized that narrowing of § 1981 was ameliorated by existence of Title VII).

729 F.Supp. at 1545–46. Applying the contract test to the issue before it as to whether a change of job from courier to dispatcher created a new and distinct relationship, the district court stated:

> [T]he courier to dispatcher change was more in the nature of a lateral transfer than a promotion. Neither couriers nor dispatchers have supervisory responsibilities. Both are hourly, nonsupervisory employees. While the jobs involved different tasks, the level of responsibility is essentially the same. Couriers are responsible for timely and proper pick-up and delivery of parcels. Dispatchers are responsible for relaying customers' orders to couriers. They do not originate or create the orders they relay to couriers. Nor is there any significant difference in pay; White, had he become a dispatcher, would have received a $1 per hour increase, but would have remained a supervised, hourly employee. Such minor differences in courier and dispatcher tasks and pay do not rise to the level of an "opportunity to enter into a new contract with the employer," *Patterson,* 109 S.Ct. at 2377, nor are they equivalent to

the position changes at issue in *Hishon* or *Mallory.* Were the Court to hold otherwise, virtually all requests for changes in job assignments would be swept back within the ambit of § 1981, a result at odds with the thrust of *Patterson.*

729 F.Supp. at 1546.

One other Court of Appeals decision, *Rountree v. Fairfax County School Bd.,* 933 F.2d 219 (4th Cir.1991), noted earlier, should be discussed.[7] There, plaintiffs, black school teachers employed by Fairfax County Public Schools, brought suit alleging violations of § 1981 due to the school board's adoption of a merit pay system and their inability to gain access to the benefits of that system. Under the system, a teacher with enough years of employment and a teaching evaluation of "exemplary" or "skillful" rather than merely "effective" would be classified as Career Level II, an elevation from Career Level I. *Id.* at 221. This change would not alter job duties or responsibilities nor was it a prerequisite to promotion to management positions. *Id.* Rather, Career Level II status would "determine eligibility for certain merit pay increments...." *Id.* Evaluations of teaching effectiveness would become less frequent also. Plaintiffs were rated as "effective" and believed that white teachers with lesser qualifications had been rated higher because of their race. *Id.*

Particularly worth noting given the situation before this Court is the Court of Appeals' observation in *Rountree* that the plaintiffs had offered little or no argument as to how the school board's adoption of the merit pay system established a " 'new

---

7. The decisions of several other Courts of Appeals are also worthy of note. *See Wall v. Trust Co. of Georgia,* 946 F.2d 805 (11th Cir.1991) (change from customer service representative to tax analyst did not implicate new and distinct relationship); *Carter v. South Cent. Bell,* 912 F.2d 832 (5th Cir.1990) (transfer from engineering to Planning Group was precondition to promotion not implicating § 1981); *Harrison v. Associates Corp. of North America,* 917 F.2d 195 (5th Cir.1990) (change in duty allowing individual to assign work for department and occasionally train new operators outside scope of *Patterson); Bennun v. Rutgers State University,* 941 F.2d 154 (3d Cir.1991) (change in status from

associate professor to tenured professor did not implicate § 1981); *Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Educ.,* 926 F.2d 505 (6th Cir.1991) (automatic renewal of contract does not rise to level of new and distinct employment relationship); *McKnight v. General Motors Corp.,* 908 F.2d 104 (7th Cir.1990) (transfer of executive from accounting to manufacturing division in the same plant not a new and distinct contractual relationship); *Mozee v. American Commercial Marine Service Co.,* 940 F.2d 1036 (7th Cir.1991) (change from crane operator to Gantry crane operator or leadman did not implicate § 1981).

and distinct' contractual relationship sufficient to satisfy the *Patterson* standard." *Id.* at 224. Further, with regard to the eligibility for merit pay and the less frequent evaluations, the plaintiff had "devote[d] no discussion in her brief as to how such factors rise to the level of a 'new and distinct' contractual relationship." *Id.* The Court went on to note that the district court in *White* had concluded that the "contract test" was preferable to the other tests from *Malhotra,* and the Court concluded that the *"White* analysis [made] clear that any contractual changes brought about by the School Board's merit pay system fail[ed] to satisfy *any* of the *Malhotra* interpretations of *Patterson." Id.* (emphasis in original).

Various district courts have also passed on the proper application of the *Patterson* "new and distinct relation" test. Although these cases produce no clear-cut set of rules for finding a claim under § 1981, they provide the Court some guidance in assessing the relative merits of plaintiff's claim.

As a general rule, most district courts have found that for a "new and distinct relation" to arise there must be more than a mere change in pay or title.[8] Numerous courts have offered factors to guide in assessing the existence of a cognizable claim under § 1981, including changes: in the method of calculating the employee's salary (i.e., change in status from hourly to salaried employee); in the employee's responsibility level; in the qualifications required for the new job as opposed to the old position; in the employee's status within the employer's organization; in the employee's duties from non-supervisory to supervisory or managerial; in daily duties; in potential liabilities; and in pension and other benefits. *Guzman v. El Paso Natural Gas Co.,* 756 F.Supp. 994, 997–99 (W.D.Tex. 1990).[9]

Obviously, the above list is not exhaustive as many other factors may be included in making the determination of whether there exists an actionable § 1981 claim in a given case. It is clear, however, that the Court should look at the changes in the employee's situation as a whole and determine if all the changes, individual as well as within the employer's organization, work to create a new and distinct relation between the parties. *Id.*

### D.  Analysis

■   Like the Court in *White v. Federal Express Corp.,* 729 F.Supp. 1536 (E.D.Va. 1990), *aff'd,* 939 F.2d 157 (4th Cir.1991), this Court would employ the "contract test" of the tests discussed above. It is the most faithful interpretation of the Supreme Court's judgment in *Patterson.* Having taken that position, it is clear to this Court that plaintiff has failed to state a genuine

---

**8.** *See James v. Int'l Business Machines Corp.,* 737 F.Supp. 1420 (E.D.Pa.1990) (promotion from non-management position to management position would not equate to a new and distinct relationship as plaintiff remained employee and outside the scope of *Patterson* ); *Frazier v. First Union Nat'l Bank,* 747 F.Supp. 1540, 1550 (W.D.N.C.1990) ("normal career ladder progressions ... do not create a different employment relationship." Promotions from Secretary A to Program Coordinator and from Operations Analyst B to Training Analyst are not cognizable under *Patterson* ); *Adames v. Mitsubishi Bank, Ltd.,* 751 F.Supp. 1548, 1557 (E.D.N.Y.1990) ("routine 'single-jump' promotions involving only higher pay or title increases are not actionable under *Patterson."* Change in grade of bank clerk or manager not actionable); *Waller v. Consolidated Freightways Corp. of Delaware,* 767 F.Supp. 1548 (D.Kan.1991) (promotion of dock manager to account manager not actionable as the move to account manager would have only entailed salary increase without concomitant changes in responsibilities or duties); and *Guliford v. Beech Aircraft Corp.,* 768 F.Supp. 313 (D.Kan.1991) (promotion from Crew Metal Bond Worker to Crew Chief did not create new contract or fundamentally change relationship between employer or employee).

**9.** *See Wilburn v. Dial Corp.,* 724 F.Supp. 521 (W.D.Tenn.1989) (promotion to position of Production Manager from Senior Quality Control Chemist would rise to the level of a new and distinct relation as between plaintiff and defendant); *Coleman v. Dow Chemical Co.,* 747 F.Supp. 146 (D.Conn.1990) (promotion from Senior Maintenance Technician to Supervisor formed a "new and distinct relation" between employer and employee); *Guzman v. El Paso Natural Gas Co.,* 756 F.Supp. 994 (W.D.Tex. 1990) (promotion from corporate attorney to member of corporation's Board of Directors which owned a minority interest in plaintiff's company raised question of fact under § 1981).

issue of material fact so as to survive defendant's Motion for Summary Judgment.

There was no change in the contractual relationship between defendant and Williamson, the employee plaintiff claims was improperly made Account Intermediate, just as there would have been none had plaintiff's position been changed to Account Intermediate. The shift in position was nothing more than a lateral transfer: Williamson occupied the same office, remained an hourly employee, had the same supervisor, and enjoyed very little increase in pay compared to what plaintiff received.

Plaintiff argues that the tasks given Williamson in the Account Intermediate position were so different from her own as to create a new and distinct relationship. However, a change in tasks does not necessarily result in a change in contractual relationship. A change in level of responsibility is necessary such as a change from a clerk to a supervisor. *See Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908 (4th Cir.1989). Plaintiff has failed to demonstrate such a change here.

Both sets of duties were clerical in nature. In fact, comparison of the two sets of duties shows that they were not greatly different. Plaintiff's tasks included accountability for paperwork through filing. Williamson was also required to perform filing tasks in the Account Intermediate position: (13) filing or distributing daily computer reports; (16) checking out, distributing, or filing weekly computer reports; (17) checking out, distributing, or filing monthly computer reports; and (18) inputting branch work daily. A review of plaintiff's duties also shows that she did more than simply act as a file clerk: (3) preparing information for typing insurance cancellation letters for auto and unit loans and typing letters; (5) analyzing auto and unit loans to determine which ones needed insurance and/or title letters and typing letters. Though there are differences between the two positions, there is not enough difference to conclude that a new and distinct relationship existed between defendant and any employee who moved from Account Junior to Account Intermediate.

Several of plaintiff's other arguments may be disposed of due to their lack of support in the record. Plaintiff's argument concerning the difference in pay is contradicted by her own trial exhibits as noted earlier. Plaintiff's statements regarding defendant's pay scale are also unsupported, and plaintiff fails to describe how the pay scale denominations of H01 and H06 impact on her case. Further, plaintiff's argument that one position would or would not have been covered by the Fair Labor Standards Act is completely without merit.

Plaintiff also argues that she would have had the opportunity for higher advancement in the company had she been changed to Account Intermediate and that this is an element of a new and distinct relationship. There is no evidence as to whether Williamson moved to higher positions in the company. Plaintiff offers the deposition of Sondra Folsom, another of defendant's employee's, who apparently moved from Account Junior to Account Intermediate and then to Account Senior. Even though Folsom may have moved to positions higher than Account Intermediate, it cannot be stated with any certainty that such movement was an element of any new contractual relationship between her and defendant by virtue of her position as Account Intermediate. *See Dicker v. Allstate Life Insurance Co.*, 730 F.Supp. 111, 114 (N.D.Ill. 1989). Plaintiff has produced no support for the position that movement from Account Junior to Account Intermediate was a prerequisite to movement from Account Intermediate to Account Senior or that there was the possibility of movement beyond those positions. This Court will not engage in the sort of speculation necessary to arrive at the conclusion that plaintiff could have eventually moved up the company ladder had she been made an Account Intermediate, a position only marginally different from her own.

Plaintiff next argues that she did not have access to various pieces of office equipment which Williamson and Folsom did: specifically, a telephone, a computer terminal, and an adding machine. Williamson's Deposition indicates that she only had *access* to a computer terminal and *shared* a

telephone. Apparently she did have her own adding machine. She also had a stapler, paper clips, pencils, pens, and paper. Even assuming that all of this is true, the ludicrous nature of an inquiry into office supplies to determine whether a defendant has violated a plaintiff's civil rights is hardly worthy of this Court's attention, and certainly cannot constitute an element of a new and distinct relationship under § 1981.

Finally, plaintiff states that Williamson was allowed to work overtime while her own requests to do so were rejected. Even if this is true, plaintiff has not offered any argument that overtime work was somehow an incident of the position of Account Intermediate. This difference between plaintiff's work schedule and Williamson's could have many explanations, none of which this Court will entertain due, again, to the speculative nature of such an inquiry.

Plaintiff has failed to identify any genuine issue of material fact precluding the entry of summary judgment on her claim. Neither has she convinced this Court that the Civil Rights Act of 1991 should be applied retroactively so as to lighten her burden under the summary judgment standard.

IT IS, THEREFORE, ORDERED that defendant's Motion for Summary Judgment be, and the same hereby is, GRANTED.